271 So.2d 466 (1972)
J. Parks STEWART, Individually and As Administrator of the Estate of Jane R. Stewart, Deceased, Appellants,
v.
Freddie LaVerne GILLIAM and Robert Leo Bradley, Appellees.
No. 71-785.
District Court of Appeal of Florida, Fourth District.
December 12, 1972.
Rehearing Denied January 22, 1973.
Question Certified January 22, 1973.
William Ford Duane, of Robertson & Williams, Orlando, for appellants.
R. James Stroker and Fred M. Peed, of Gurney, Gurney & Handley, Orlando, for appellee Freddie Laverne Gilliam.
Monroe E. McDonald and John Singer McEwan, II, of Sanders, McEwan, Mims *467 & McDonald, Orlando, for appellee Robert Leo Bradley.
MAGER, Judge.
This appeal from a final summary judgment in favor of the defendants presents this court with the proposition of whether a plaintiff may maintain a cause of action and recover for the physical consequences of a mental or an emotional disturbance caused by a negligent act in absence of physical impact.
Plaintiffs Jane R. Stewart and J. Parks Stewart, her husband, originally initiated their complaint against the defendants, Gilliam and Bradley, seeking compensatory damages and alleging, inter alia, that on January 20, 1970, defendants negligently and carelessly operated their motor vehicles so as to collide with each other and ultimately to collide with the residence of the plaintiffs. The complaint further alleged that "as a direct and proximate result of the negligence of the Defendants, Freddie LaVerne Gilliam and Robert Leo Bradley, the Plaintiff, Jane R. Stewart, suffered serious and grievous personal injuries, including a shock to her nervous system which resulted in a coronary insufficiency and myocardial infarction and a left lateral cerebellar lesion." Defendants' vehicles were involved in an intersectional collision, both being propelled over the curb, the Gilliam vehicle coming to rest at an oak tree on the Stewarts' property and the Bradley vehicle directly striking the masonry residence of the plaintiffs causing minor damage to the dwelling. The accident occurred shortly before nine in the morning; Mrs. Stewart was still in bed but not asleep. Mrs. Stewart heard the crash at the intersection and then heard the crash of the cars striking the tree and the house. When Mrs. Stewart heard the car hit the house she got out of bed, went to the front porch, looked through the window and saw Bradley's car against her house with steam coming out of the radiator; she was also able to observe the Gilliam vehicle resting against the oak tree. She was unable to get out the back door of her house through the kitchen because of the Bradley vehicle so she ran back through the den and out another back door to ascertain if anyone was hurt. She then went back into her house to use the telephone also permitting various people to come into her house to use the phone.
Within 15 minutes after returning to the house, Mrs. Stewart went back to bed because of chest pains and approximately two hours later she was in the intensive care unit of the Orange Memorial Hspital. At the time the car struck Mrs. Stewart's house she said she felt no physical impact. When she was examined at the hospital there were no outward signs of physical injury. Mrs. Stewart described the "impact" as follows:
"Q When the accident occurred, you say you heard it. Did you feel the car hit the house?
"A I certainly did.
"Q Could you describe that for me?
"A Well, it just hit with a great thud and then it, evidently, bounced back and came forward and hit my house twice.
"Q Did it shake the house or did it shake the bedroom?
"A I wouldn't say it shook the house. The house is masonry, but it hit with a great thud, enough that my cat jumped down, and he was running around like he was crazy.
"Q Then, as I understand it, you could hear it, because it was a large crash?
"A Certainly could. My house is small, yes, sir.
"Q You actually couldn't tell it in the sense that it shook you or the house?
"A Well, I couldn't say that it shook the masonry house. My house doesn't *468 vibrate at all with the traffic going by, because it is all masonry and concrete floor.
"Q I don't suppose it shook either you or the house, as far as you can recall?
"A I wouldn't say so."
Mrs. Stewart remained at the hospital from January 20 until February 17, 1970.[1]
Following the accident on January 20, Dr. Morton Levy, who had been Mrs. Stewart's family physician for a 20-year period, examined her and diagnosed her condition as being myocardial infarction; she subsequently developed a cerebral embolus.[2] Dr. Levy indicated that Mrs. Stewart had no prior history of coronary disease although she had hypertension over a period of years. In his opinion as to what caused the myocardial infarction and cerebral embolus, Dr. Levy stated:
"A I think her cerebral embolus was secondary to a myocardial infarction, and I think her myocardial infarction was probably secondary to severe and sudden fright, secondary to this automobile crashing into her house."
* * * * * *
"Q Doctor, is it just as probable that the myocardial infarction was caused by the physical activities related to the accident, such as the running outside to find out what happened and running back in to make a phone call and moving around when people came into the house and talking to some people, if she did talk to some people?
"A I don't think so.
"Q In other words, you think it was the fright?
"A I think the fright was an essential part of this picture. I really do."
* * * * * *
"Q Okay. Then in your opinion, Doctor, based on the history given you and the examination and the treatment and your following the patient, the cause of the myocardial infarction was the fright she suffered as the result of hearing the impact to the house or accident at her house?
"A Basically, yes."
* * * * * *
"A Well, what I knew of her and what I know of what happened, I think that what happened that day was due to the accident, and it wasn't her day to have a myocardial infarction. Put it that way. I don't think it was just fortuitous that she happened to have one at the time she was sitting there when this happened. That is stretching, I think, probability too much."
In entering the summary judgment the trial court made the following findings:
"That although there was an impact between the house in which the Plaintiff resided and the Defendant ROBERT LEO BRADLEY'S vehicle, there was no physical contact with the Plaintiff.
"That there was some evidence there was or may have been some tremor in the house but the Plaintiff was not conscious of this.

*469 "That there was some evidence that the only other thing that reached the Plaintiff was the sound of the impact of Defendant's automobile with the house, and "The medical testimony shows that the Plaintiff suffered a myocardial infarction as a reaction to the fright caused by the noise of the collision of Defendant's vehicle with the house."
The trial court's entry of the summary judgment is consistent with the judicially established precedent heretofore in effect, namely, that no recovery can be had for mental pain and suffering unaccompanied by any physical injuries in the absence of wantonness, wilfulness or malice. Clark v. Choctawhatchee Electric Co-Operative, Fla. 1958, 107 So.2d 609; Crane v. Loftin, Fla. 1954, 70 So.2d 574; Dunahoo v. Bess, 1941, 146 Fla. 182, 200 So. 541; International Ocean Tel. Co. v. Saunders, 1893, 32 Fla. 434, 14 So. 148; Kirksey v. Jernigan, Fla. 1950, 45 So.2d 188. Cf. Way v. Tampa Coca Cola Bottling Company, Fla.App. 1972, 260 So.2d 288.
Dunahoo was concerned with the careless and negligent manner in which the plaintiff's body was handled, the court finding no recovery for mental anguish unconnected with physical injury. Kirksey also involved the manner in which the dead body of plaintiff's child was handled, but here the court, while reaffirming the rule as it related to a negligent breach of contract, refused to extend the rule to a case founded purely in tort where the wrongful act reasonably implied malice. International Ocean Tel. Co. involved mental pain and suffering as a result of the failure of a telegraph company to promptly deliver a telegraphic message. No recovery was permitted. Cf. Griffith v. Shamrock Village, Fla. 1957, 94 So.2d 854.
In the Crane case the plaintiff sought damages for personal injuries alleged to have resulted from fright and mental anguish unaccompanied by direct physical impact, i.e., plaintiff had to flee from her automobile in order to avoid being struck by a locomotive which was alleged to have been operated at an excessive speed across a heavily traveled highway. The court clearly announced the rule that absent a showing of wilful and wanton negligence on the part of the railroad, plaintiff could not recover damages for personal injuries resulting from fright and mental anguish unaccompanied by direct physical impact or trauma.
This rule was recently restated in Clark, supra, where the Supreme Court permitted plaintiff to recover for an emotional disturbance caused by an electrical shock. There were no burns on the body of the plaintiff but she did feel a shock. There was no doubt but that the court found impact. A high power line carrying 7,200 volts of electricity had fallen on some gasoline pumps near a building where plaintiff was ironing and the power line discharged an electric current which shocked the plaintiff. The court observed:
"But the symptoms were sufficient to warrant the conclusion that she was, indeed, shocked instead of having become emotionally upset by fright from the electrical display."
Florida, therefore, has aligned itself with those jurisdictions requiring physical impact as a prerequisite for maintaining a cause of action for personal injuries  so that there can be no recovery for injuries resulting from a mental or emotional disturbance unaccompanied by physical trauma. The rule previously announced has been rejected by a majority of American jurisdictions and England and has been condemned as unjust and contrary to experience and logic. See U. of Miami L.R., Vol. 13 at 116; Falzone v. Busch, 1965, 45 N.J. 559, 214 A.2d 12;[3] Niederman v. Brodsky, *470 1970, 436 Pa. 401, 261 A.2d 84;[4] Daley v. LaCroix, 1970, 384 Mich. 4, 179 N.W.2d 390;[5] Colla v. Mandella, 1957, 1 Wis.2d 594, 85 N.W.2d 345;[6] Battalla v. State, 1961, 10 N.Y.2d 237, 219 N.Y.S.2d 34, 176 N.E.2d 729;[7] Trent v. Barrows, 1965, 55 Tenn. App. 182, 397 S.W.2d 409;[8] Dillon v. Legg, 1968, 68 Cal.2d 728, 69 Cal. Rptr. 72, 441 P.2d 912;[9] 38 Am.Jur.2d Fright, Shock, etc. § 13 et seq., p. 16, footnote 7.[10]
*471 The impact doctrine was first enunciated in England in 1888 in the case of Victorian Railways Commissioners v. Coultas, 13 App.Cas. 222; and although it was repudiated in the subsequent English case of Dulieu v. White & Sons, 2 K.B. 669 (1901), it seemingly became entrenched in American civil jurisprudence. Ewing v. Pittsburgh, etc. R. Co., 1892, 147 Pa. 40, 23 A. 340; Haile's Curator v. Texas & Pacific R. Co., 5 Cir.1894, 60 F. 557; Mitchell v. Rochester Ry. Co., 1896, 151 N.Y. 107, 45 N.E. 354; and Ward v. West Jersey, etc. R. Co., 1900, 65 N.J.L. 383, 47 A. 561. Oddly enough, however, although the aforementioned early American precedents have since been overruled they are still being followed by some jurisdictions, including Florida. See Falzone v. Busch, supra; Niederman v. Brodsky, supra; Battalla v. State, supra. See also 64 A.L.R.2d 100. The decisions in Falzone, Niederman and Battalla have given the "impact doctrine" exhaustive treatment, discussing in great detail the origin of the doctrine, the rationale for its application and the reasons for its modern-day rejection.
It is our view that this state should now align itself with the overwhelming majority of jurisdictions which have had occasion to review the impact rule during the past forty years and which jurisdictions have abandoned the rule or refused to adopt it. See footnote 1, Niederman v. Brodsky, supra, 261 A.2d at p. 85. See also Hollie v. Radcliffe, Fla.App. 1967, 200 So.2d 616.
In advocating a reexamination and rejection of the impact rule we cite with approval the eloquent observations made by Mr. Justice Adkins in Gates v. Foley, Fla. 1971, 247 So.2d 40, 43:
"The law is not static. It must keep pace with changes in our society, for the doctrine of stare decisis is not an iron mold which can never be changed. Holmes, in his The Common Law (1881), p. 5, recognizes this in the following language:
`The customs, beliefs, or needs of a primitive time establish a rule or a formula. In the course of centuries the customs, belief, or necessity disappear, but the rule remains. The reason which gave rise to the rule has been forgotten, and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things; and then the rule adapts itself to the new reasons which have been found for it, and centers on a new career. The old form receives a new content, and in time even the form modifies itself to fit the meaning which it has received.'"
In Steinhauer v. Steinhauer, Fla.App. 1971, 252 So.2d 825, 832, this Court, in the spirit of Gates v. Foley, supra, similarly observed:
"`* * * If it is argued * * * that stare decisis compels us to perpetuate a rule  out of tune with the life around us, at variance with modern-day needs and with concepts of justice and fair dealing  a ready answer is at hand. The rule of stare decisis was intended not to *472 effect a petrifying rigidity, but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive and no principle constrains us to follow it.'" (Emphasis added.)
It is our view that the impact requirement is "at variance with modern-day needs and with concepts of justice and fair dealing" and should be rejected. As the more recent cases point out, supra, there have been at least three basic arguments which have served as the underlying reasons for adhering to the impact doctrine: the difficulty in proving causation between the claimed damages and the alleged fright or shock; the fear of fraudulent or exaggerated claims; and the possible flood of litigation.
As a preliminary observation, it should be pointed out that the case sub judice concerns the right of a plaintiff to maintain an action and submit her case to a jury where it is alleged that a defendant's negligent act, although involving no physical impact, has caused a mental or emotional disturbance resulting in bodily injury or illness. This factual circumstance is to be distinguished from a case where a plaintiff seeks to maintain a cause of action for an emotional disturbance without physical effect. In other words, we are not herein concerned with any action for recovery for mental or emotional disturbance unconnected with a resulting physical injury. Arcia v. Altagracia Corporation, Fla.App. 1972, 264 So.2d 865. Instead, we are concerned with a defendant's wrongful act without direct physical impact but which occasions a mental disturbance that operates internally to produce physical injuries of a definite, objective and ascertainable nature. 38 Am.Jur.2d, supra, § 18, pp. 22-23. See also 64 A.L.R.2d supra, at p. 126. As stated in Trent v. Barrows, supra, 397 S.W.2d at p. 411:
"The suit, under such circumstances, is based upon the physical pain and suffering endured by the plaintiff, and not upon the fright itself. Such pain and suffering of course must be the proximate result of the negligence. * * *"
See also Dillon v. Legg, supra. To further illustrate the foregoing in light of the facts in the instant case, plaintiff seeks to maintain a cause of action for her coronary created by the emotional disturbance and resulting from the alleged negligence of the defendants; the plaintiff is not, as we understand her complaint, seeking to maintain a cause of action for mere fright or mental anguish brought about by the actions of the defendants. In this regard see Arcia v. Altagracia Corporation, supra.
Turning to the first of the three basic arguments, the question of proving or disproving causation between the claimed injuries and damages and the alleged fright or shock may indeed have been a difficult undertaking in 1888 when the impact rule was first announced. Such is not the situation today. An extensive review of medical treatises is not necessary in order to recognize that medical science has come a long way since the turn of the century; the changes brought about by modern scientific techniques and the advancement made by modern medicine have been overwhelming. This is particularly true in the refinement of techniques for diagnosing the causal connection between emotional states and physical injuries.
As the Supreme Court of Pennsylvania properly observed in Niederman v. Brodsky, supra, 261 A.2d at p. 86:
"... [T]he effects of hyperemotional states of the human body no longer are shrouded in mystery or myth.
"New equipment and research, improved education and diagnostic techniques, and an increased professional understanding of disease in general require us now to give greater credit to medical evidence. Other jurisdictions have also recognized that this advancement in the medical arts should and could be legitimately reflected in changes in the legal field...."
*473 Cf. Schurk v. Christensen, 1972, 80 Wash.2d 652, 497 P.2d 937, 943. It is somewhat inconsistent to urge that the medical profession is unable to establish a causal connection in a case where there is no impact but in the case where there is the slightest impact (a bruised finger or toe) the medical profession is miraculously invested with the uncanny and unique knowledge and facility to diagnose the veracity of a causal connection between emotional states and physical injuries. A reading of the Florida decision in Clark v. Choctawhatchee, supra, reflects no lack of confidence of the Supreme Court in the ability of medical science to determine the extent of Mrs. Cark's emotional and mental balance resulting from an electrical shock. Similarly, the Court was not fearful of the ability of medical science to establish a causal connection between insanity and the physical injury in Lyng v. Rao, Fla. 1954, 72 So.2d 53, at p. 56, where Mr. Justice Drew observed:
"... Many serious accidental injuries  especially those affecting internal organs  are not visible to the eye, and yet we know that such constitute a great part of compensable injuries. An injury to the brain is seldom observable  except by symptoms. Insanity, resulting from an injury received in the course of employment, is compensable... ."
What, therefore, is so magical about "impact" that makes its presence a guarantee of the authenticity of mental disturbances but makes its absence a supposed spawning ground for fakery? What do we really require when we limit recovery to "impact"? In Daley v. LaCroix, supra, footnote 9, 179 N.W.2d at p. 394, the application of "impact" was poignantly illustrated:
"`Apart from some quite untenable notions of causal connection, the theory seems to be that the "impact" affords the desired guarantee that the mental disturbance is genuine. But the same courts have found "impact" in minor contacts with the person which play no part in causing the real harm, and in themselves can have no importance whatever. "Impact" has meant a slight blow, a trifling burn or electric shock, a trivial jolt or jar, a forcible seating on the floor, dust in the eye, or the inhalation of smoke. The requirement has even been satisfied by a fall brought about by a faint after a collision, or the plaintiff's own wrenching of her shoulder in reaction to the fright. "The magic formula `impact' is pronounced; the door opens to the full joy of a complete recovery." A Georgia circus case has reduced the whole matter to a complete absurdity by finding "impact" where the defendant's horse "evacuated his bowels" into the plaintiff's lap.'"
As pointed out in 38 Am.Jur.2d Fright, Shock, etc. § 1, p. 5:
"A suggested explanation of the distinction made by some courts, based on whether an impact accompanies a mental or emotional disturbance, is that the physical impact operates as a `voucher for the truth of the plaintiff's claim.' Some authorities are of the opinion that the distinction based upon an impact is merely a pretext for permitting the maintenance of the action where there is an impact, or the slightest impact, because of the injustice of the rule denying recovery."
The question is not really one of "impact" but rather the causal connection between the negligent act and the ultimate injury  a circumstance which in the last analysis does not seem to pose problems any more difficult to solve in a non-impact case than in an impact case. Causation is not peculiar to cases without impact; it is an ingredient in all types of personal injury litigation. The fact that there may be difficulty in proving or disproving a claim should not prevent a plaintiff from being given the opportunity of trying to convince the trier of fact of the truth of the claim. The question is one that falls within the province of a jury in light of the circumstances in the particular case. *474 As similarly stated in 9A Fla.Jur., Damages § 43, at pp. 272-273:
"The plaintiff in an action for personal injuries may recover compensation for his physical pain and suffering which result from the wrongful acts of the defendant. Since pain and suffering have no market price, are not capable of being exactly and accurately determined, and there is no fixed rule or standard whereby damages for them can be measured, the determination of the amount of damages, in this class of cases, is left to the experience and good sense of jurors, in accordance with the usual practice and subject to correction by the courts."
Decisions denying recovery absent physical impact have sometimes turned upon the proposition that a physical injury resulting from a mental or an emotional disturbance could not reasonably have been anticipated at the time of the wrongdoing; such injuries are not reasonably foreseeable and are too remote. Cf. Dillon v. Legg, supra.
There is, however, a substantial conflict of authority on the general question of whether all specific damages must be foreseeable in an action of negligence. See Dillon v. Legg, supra. But, as stated in 38 Am.Jur.2d, supra, at pp. 27-28:
"... The preferred view is that while the element of foreseeability of result may be important in determining whether an actor is negligent  that is, whether he should have foreseen that some harm might result from his conduct  the factor does not apply in determining whether he is liable for the actual results of his negligence. Accordingly, the better rule is that if it is once established that an actor is guilty of negligence or other misconduct which results in mental disturbance and illness or bodily injury, the doctrine of foreseeability is not further applicable, and that the actor is liable for the results of his misconduct even though he could not have foreseen the form and extent of the injury. . .." (Emphasis added.)
In Florida the general rule is to the effect that a person is liable in tort for all the consequences that reasonably and naturally flow or follow from his wrongful act whether or not these consequences were actually contemplated or foreseen. King v. Cooney-Eckstein Co., 1913, 66 Fla. 246, 63 So. 659; 9A Fla.Jur. Damages § 38. Once the wrongful act is established the liability extends to all the consequences that naturally, proximately and reasonably follow and result from such act. This rule would seem to comport with the proposition that if the mental disturbance with its attendant physical manifestations reasonably and naturally flow from the tortious act then the actor is liable even though he may not have foreseen the specific form and extent of the injury  it is not unreasonable to hold the wrongdoer liable for all consequences directly resulting from his wrongful act.
With respect to the second argument that rejection of the old impact rule would result in fraudulent or exaggerated claims, such an assertion would deny to a plaintiff the right to be heard  the opportunity to present the case to a jury  the chance to be compensated for an injury negligently incurred. Adherence to "impact" on this basis seems to say very little for our system of jurisprudence because it seemingly constitutes a tacit admission that our system is incapable of weeding out fraudulent claims. It would be difficult to imagine that the bench, bar, jury and medical profession cannot collectively cope with this problem  a problem which apparently has been successfully dealt with in those cases where recovery was sought for emotional disturbances following the most trivial impact. On the contrary, the courts of this state have been able to separate the genuine from the bogus claims and there is no reason to assume that this problem cannot be properly dealt with in instances where there has been no impact.
*475 As was stated in Battalla v. State, supra, 219 N.Y.S.2d at p. 38, 176 N.E.2d at pp. 731-732:
"In the difficult cases, we must look to the quality and genuineness of proof, and rely to an extent on the contemporary sophistication of the medical profession and the ability of the court and jury to weed out the dishonest claims."
In Falzone v. Busch, supra, 214 A.2d at p. 16, the Supreme Court of New Jersey observed:
"`To hold that all honest claims should be barred merely because otherwise some dishonest ones would prevail is stretching the public policy concept very close to the breaking point, especially since it is quite as simple to feign emotional disturbance plus slight impact and get in "under the wire" of one of the exceptions as it is to feign emotional disturbance sans impact. The arbitrary denial of recovery in all cases not falling within the realm of one or another of the exceptions discourages the bringing of meritorious actions and at the same time allows the prosecution of fabricated claims, for surely those capable of perjuring evidence will not hesitate to manufacture one additional feature of the occurrence  a slight impact  to insure recovery.'"
One of the better reasoned expressions on the fallacy of the "fear" of fraud is found in Neiderman, supra, 261 A.2d at p. 87:
"Every court that has been confronted with a challenge to its impact rule has been threatened with the ominous spectre that an avalanche of unwarranted, trumped-up, false and otherwise unmeritorious claims would suddenly cascade upon the courts of the jurisdiction. The virtually unanimous response has been that (1) the danger of illusory claims in this area is no greater than in cases where impact occurs and that (2) our courts have proven that any protection against such fraudulent claims is contained within the system itself  in the integrity of our judicial process, the knowl-of expert witnesses, the concern of juries and the safeguards of our evidentiary standards."
See also, Dillon v. Legg, supra.
The third argument, to perpetuate the old impact rule on the basis that its rejection would precipitate a flood of litigation, is also an unsatisfactory and tenuous contention. In those states following the majority rule allowing recovery for psychic injuries without impact "the feared flood tide of litigation has simply not appeared". Niederman v. Brodsky, supra. Nor has it been demonstrated that the amount of litigation in those states with no impact rule is greater than in those states with the impact rule.
More significant than what may have been the experience in other states is the basic principle that a fear of expansive litigation should not deter courts from granting relief in meritorious cases.
The fundamental concept of justice under the law would reject any rule that measures the availability of a forum on the nebulous principle of "a floodtide of litigation" or "a virtual avalanche of cases". There is no more bedrock principle of law than that which declares that for every legal wrong there is a remedy and that every litigant is entitled to have his cause submitted to the arbitrament of the law. Tidwell v. Witherspoon, 1885, 21 Fla. 359. The principle that for every wrong there is a remedy is embodied in the Declaration of Rights of the Florida Constitution which provides that the Florida courts are to be open so that every person shall have a remedy by due course of law. (Section 21). It is far more consistent with justice to be concerned with the availability of a judicial forum for the adjudication of individual rights than to deny access of our courts because of speculation of an increased burden.

*476 "It is the business of the law to remedy wrongs that deserve it, even at the expense of a `flood of litigation'; and it is a pitiful confession of competence on the part of any court of justice to deny relief upon the ground that it will give the courts too much work to do." Prosser, Intentional Infliction of Mental Suffering: A New Tort." 37 Mich.L.Rev. 874 (1939).
As the Supreme Court of California observed in Dillon v. Legg, supra, 69 Cal. Rptr. at page 85, 441 P.2d at page 925: "Legal history shows that artificial islands of exceptions, created from the fear that the legal process will not work, usually do not withstand the waves of reality and, in time, descend into oblivion."
It is somewhat ironical to observe that the principle which this court seeks to establish was the position essentially advocated in 1893 by the Honorable Milton H. Mabry, a Justice of the Supreme Court of Florida, in his dissent in the International Ocean Telegraph Company case, supra.[11] This decision appears to be the earliest enunciation of the impact rule in Florida. Mr. Justice Mabry pointed out in his dissent that "[i]n actions of tort the plaintiff has a right to recover such damages as result proximately and naturally from the wrongful act of the defendant". Justice Mabry further stated, 14 So. at p. 154:
"`... Every infraction of a legal right causes injury, in contemplation of law. The party being entitled, in such a case, to recover something, why should not an injury to the feelings, which is often more injurious than a physical one, enter into the estimate? Why, being entitled to some damage by reason of the other party's wrongful act, should not the complaining party recover all the damages arising therefrom?'"
Very recently the Second District rejected the necessity of impact in a suit maintained on the theory of implied warranty and negligence where the evidence presented showed no physical impact but only a mental reaction. Way v. Tampa Coca Cola Bottling Company, supra. In the Way case the plaintiff, while drinking a bottle of Coca Cola, discovered a foreign substance resembling a rat with the hair sucked off and became nauseated and vomited. Referring to the decision in Kirksey v. Jernigan, supra, 260 So.2d at 289, 290, the Second District observed:
"... The court in that case affirmed the rule that no recovery could be had for mental pain and anguish unconnected with physical injury but they nevertheless allowed the plaintiff to recover for mental pain and anguish on other theories. This is prevalent throughout all the cases. The courts have affirmed the rule but on the factual situation have allowed recovery. We simply think the time has come, as was pointed out in appellant's brief, that in factual situations such as was presented in the instant case, the trend is toward the protection of the ultimate consumer and he will be allowed to recover whatever the theory. ..." (Emphasis added.)
The Supreme Court of Michigan in Daley v. LaCroix, supra, 179 N.W.2d at page 395, has best stated what we feel is the applicable rule:
"... [W]here a definite and objective physical injury is produced as a result of emotional distress proximately caused by defendant's negligent conduct, the plaintiff in a properly pleaded and proved action may recover in damages for such physical consequences to himself notwithstanding the absence of any physical impact upon plaintiff at the time of the mental shock."
General rules of practice and procedure applicable in other negligence cases would govern in these situations the only difference being a direct physical impact is not a prerequisite either to maintaining a cause *477 of action or to recovery. As stated by the Supreme Court of California in Dillon v. Legg, supra, 69 Cal. Rptr. at page 84, 441 P.2d at page 924:
"Thus we see no good reason why the general rules of tort law, including the concepts of negligence, proximate cause, and foreseeability, long applied to all other types of injury, should not govern the case now before us. Any questions that the cause raises `will be solved most justly by applying general principles of duty and negligence, and * * * mechanical rules of thumb which are at variance with these principles do more harm than good.' (2 Harper & James, The Law of Torts, supra, p. 1039; fn. omitted.) `The refusal to apply these general rules to actions for this particular kind of physical injury is nothing short of a denial of justice.' (Throckmorton, Damages for Fright (1921) 34 Harv.L.Rev. 260, 277; fn. omitted.)"
In rejecting the impact rule, as hereinabove discussed, we have not decided that the plaintiff in the case sub judice should recover but merely that the plaintiff be afforded an opportunity to present her case to a trier of fact. To hold otherwise would in our opinion "chain this state to an outmoded rule of the 19th century which can claim no current credence. No good reason compels our captivity to an indefensible orthodoxy." Dillon v. Legg, supra, 69 Cal. Rptr. at p. 85, 441 P.2d at p. 925. As the Supreme Court of Florida observed in Gates v. Foley, supra, 247 So.2d at p. 43:
"It may be argued that any change in this rule should come from the Legislature. No recitation of authority is needed to indicate that this Court has not been backward in overturning unsound precedent in the area of tort law. Legislative action could, of course, be taken, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule." (Emphasis added.)
For the foregoing reasons we reverse and remand this cause for a trial on the merits.
Reversed.
WEHLE, VICTOR O., Associate Judge, concurs.
REED, C.J., dissents, with opinion.
REED, Chief Judge (dissenting).
I take it that there is more underlying the impact doctrine than simply problems of proof, fraudulent claims, and excessive litigation. The impact doctrine gives practical recognition to the thought that not every injury which one person may by his negligence inflict upon another should be compensated in money damages. There must be some level of harm which one should absorb without recompense as the price he pays for living in an organized society.
Let us assume for a moment the case of a man lawfully driving his automobile down a wet street. Suddenly an adult pedestrian carelessly darts in front of the vehicle and falls to the ground. By quick response to the emergency the driver brings his vehicle to a stop only inches and moments from the delivery of a fatal blow to the fallen pedestrian. It takes little imagination to recognize that the motorist in this situation could temporarily suffer serious emotional upset. Such is a very real injury to the person and cannot be rationally characterized as anything other than physical. Should this injury be compensable? The injury suffered by the plaintiff's decedent in the present case is different only in degree. That difference, however, is substantial. She suffered serious physical impairment as a result of the fright engendered by the negligence of the defendants. Should compensation be permitted for her *478 injury? Unfortunately, the impact rule denies both claims. The difference in degree between the plaintiff's situation and the hypothetical suggests a different result should as a matter of policy obtain in each. The rule adopted by the majority would in my estimation allow recovery in both.
This case poses the familiar problem of preserving the separation of powers between branches of government on the one hand and doing justice in specific cases on the other. The facts so ably dealt with in the majority opinion clearly make an appealing claim for the recovery of damages and for the deviation from precedent. However, a rule which would permit recovery in the present case without creating a plethora of problems for future courts and litigants must take into account that which is socially desirable in a number of similar, but distinguishable human situations. The creation of such a rule involves more than simply a logical extension of or minor deviation from judicial precedent. It involves a detailed law-making process which has the potential for far reaching consequences. This is not for the courts, but the legislature. When the judiciary becomes involved in the process of law making, representative government is abandoned and so is the protection of the checks and balance system established by our state constitution. To illustrate the latter, if the legislature exceeds its police power by the adoption of unreasonable legislation, a citizen may turn to his court system for protection. Where may he go, however, for such protection in the case of equally arbitrary judge-made law?
Finally, if the impact doctrine is to be dispatched in a judicial forum, I would think it better for this court to affirm the trial court on the basis of established precedent and certify the question to the Florida Supreme Court so that it may yield the axe. See Lunney v. Post, Fla.App. 1971, 248 So.2d 504, dissent.
For the foregoing reasons, I am unable to concur in the majority opinion.
NOTES
[1] Mrs. Stewart died on February 16, 1971, and her husband was substituted for her "as Administrator of the Estate of Jane R. Stewart". The summary judgment was entered on the basis of the complaint as it existed prior to Mrs. Stewart's death.
[2] A chest pain and pain migrating down the arm, which Mrs. Stewart evidenced, were some of the signs reflecting myocardial infarction which Dr. Levy described as a coronary disease where a portion of the myocardia has been destroyed. A cerebral embolus is a clot from an organ other than the brain that goes to the brain and causes some neurological deficit and is referred to as a stroke.
[3] In Flazone v. Busch, supra, plaintiff became ill and required medical attention as a result of defendant's negligently driven automobile veering across the highway heading in the direction of the plaintiff, coming "so close to plaintiff as to put her in fear for her safety". The trial court granted defendant's motion for summary judgment on the basis that there was no physical impact upon the plaintiff. The Supreme Court of New Jersey reversed, concluding that plaintiff should be given the opportunity of submitting proof that she suffered substantial bodily injury and that such bodily injury was the proximate result of defendant's negligence.
[4] In Niederman v. Brodsky, supra, defendant's automobile skidded onto the sidewalk striking the plaintiff's son while they were walking. Almost immediately afterwards plaintiff claimed he suffered severe chest pain and was diagnosed to have sustained an acute coronary insufficiency, coronary failure, angina pectoris and possible myocardial infarction. Plaintiff in effect claimed that the defendant's negligently operated vehicle placed the plaintiff in personal danger of physical impact although the injuries arose in absence of any physical impact. The trial court dismissed the complaint and the Supreme Court of Pennsylvania reversed.
[5] In Daley v. LaCroix, supra, defendant's vehicle struck a utility pole causing a number of high voltage lines to snap and strike plaintiff's house causing an electrical explosion and considerable property damage. Mrs. Daley, although suffering no direct physical impact, claimed that she suffered traumatic neurosis, emotional disturbance and emotional upset as a result of the explosion and attendant circumstances. The trial judge directed a verdict against Mrs. Daley because she had failed to prove a causal relationship between the accident and her claimed personal injury. The Supreme Court of Michigan reversed.
[6] In Colla v. Mandella, supra, defendant's truck, which was left unattended, rolled down a hill and crashed into the side of plaintiff's house near plaintiff's bed making a loud noise. The damage to the house was slight  much similar to the case sub judice. At the time of the accident, plaintiff was suffering from high blood pressure and an apparent mild heart condition. Two or three minutes after the crash plaintiff came out the front door, appeared to be frightened and re-entered the house a few minutes later. He died of heart failure ten days after the accident. The attending physician gave the opinion that the excitement from the accident was sufficient cause to throw plaintiff into heart failure and that the accident precipitated the heart failure causing plaintiff attendant pain and suffering. The Supreme Court of Wisconsin affirmed the trial court's denial of defendant's motion for summary judgment.
[7] In Battalla v. State, supra, an infant plaintiff was improperly placed in a ski lift chair causing the infant to become frightened and hysterical upon descent from a mountain ski center. The infant's complaint alleged that the infant was negligently caused to "suffer `severe emotional and neurological disturbance with residual physical manifestations.'" The trial court held that the complaint stated a cause of action. The appellate division reversed the trial court, and the Court of Appeals of New York reversed the appellate court reinstating the order of the trial court.
[8] In Trent v. Barrows, supra, defendant's vehicle came upon the private premises of the plaintiff and struck the house near the front window where plaintiff was standing. Plaintiff saw the car approaching and retreated from the window. Plaintiff claimed that as a result of the imminent peril in which she was placed plaintiff suffered extreme weakness and sharp pains in her chest and was hospitalized with a diagnosis of heart attack. Plaintiff's complaint sought no recovery for fright or mental shock but rather for physical pain incident to the heart attack. The physical impact was limited to the vibrations of the house and plaintiff's body was not bruised or injured in any way. A directed verdict was entered for the defendants. The Court of Appeals of Tennessee reversed.
[9] In Dillon v. Legg, supra, the Supreme Court of California held that a mother, asserting emotional trauma and physical injury from the witnessing in close proximity of the death of a child as a result of defendant's negligence, alleged a prima facie case.
[10] See Prosser, Torts § 55, pp. 349-352 (3d ed. 1964); 2 Harper and James, The Law of Torts § 18.4, pp. 1031-1039 (1956); McNiece, "Psychic Injury and Tort Liability in New York," 24 St. John's L.Rev. 1 (1949); Smith, "Relation of Emotions to Injury and Disease: Legal Liability for Psychic Stimuli," 30 Va.L.Rev. 193 (1944); Smith and Solomon, "Traumatic Neuroses in Court," 30 Va.L.Rev. 87 (1943); Magruder, "Mental and Emotional Disturbance in the Law of Torts," 49 Harv.L.Rev. 1033 (1936); 1936 Report of N.Y.Law Rev.Comm., 375; Green, "Right Cases," 27 Ill.L.Rev. 761 (1933); Hallen, "Damages for Physical Injuries Resulting from Fright or Shock," 19 Va.L.Rev. 253 (1933); Wilson, "The New York Rule as to Nervous Shock," 11 Cornell L.Q. 512 (1926); Goodrich, "Emotional Disturbance as Legal Damage," 20 Mich.L.Rev. 497 (1922); Throckmorton, "Damages for Fright," 34 Harv.L.Rev. 260 (1921); Burdick, "Tort Liability for Mental Disturbance and Nervous Shock," 5 Colum.L.Rev. 179 (1905); Bohlen, "Right to Recover for Injury Resulting from Negligence Without Impact," 41 Am.L.Reg. 141 (1902).
[11] In 1893, the Supreme Court of Florida had only three members; and the decision in the International case was a 2 to 1 decision.