252 So.2d 825 (1971)
Jerome STEINHAUER, Appellant,
v.
Lossie S. STEINHAUER, Appellee.
No. 70-574.
District Court of Appeal of Florida, Fourth District.
August 17, 1971.
Rehearing Denied October 21, 1971.
*827 Harry G. Carratt, of Morgan, Carratt & O'Connor, Fort Lauderdale, for appellant.
R.T. Shankweiler, of Patterson, Maloney & Frazier, Fort Lauderdale, for appellee.
MAGER, Judge.
This is an appeal by Jerome Steinhauer, appellant-defendant, from a final judgment of divorce entered in favor of Lossie S. Steinhauer, appellee-plaintiff. The final judgment of divorce awarded plaintiff custody of their only child and awarded plaintiff lump sum alimony, property rights and child support. This appeal is concerned with that portion of the trial court's order awarding the entire marital home to the plaintiff "on account of her special equity therein and as for lump sum alimony"; and that portion of the order wherein the trial court specifically reserved jurisdiction for the award of alimony in the future if the circumstances justify such an award.
There is little if any factual dispute in this case; there is, however, an obvious conflict between the respective parties' interpretation of such facts as they relate to the final judgment. Plaintiff and defendant were married for approximately twenty-five years before divorce proceedings were instituted. The plaintiff-wife is 57 years old and the defendant-husband is 49 years old. For the last twenty years of their marriage both parties worked together in a drapery business known as Steinhauer Interiors. The wife entered into the interior design business shortly after the marriage of both parties in 1945. The husband worked with the wife in the interior design business for over twenty years. The parties maintained two checking accounts. One account was designated as "Jerome Steinhauer and Lossie Steinhauer" and the other account was designated as "Steinhauer Interiors". The record reflects that both parties had access to both accounts and that both parties wrote checks against both accounts. The evidence is not clear as to when the "Jerome Steinhauer and Lossie Steinhauer" account was opened; it appears however that the "Steinhauer Interiors" account was opened some time in 1964 or 1965. The record reflects that while both parties worked side by side in the interior design business, each party apparently had separate jobs and customers in their interior design business. The husband's earnings from his customers went into the joint account and the wife's earnings from her customers went into the "Steinhauer Interiors" account. The record reflects that the wife actually ran the business and that the husband worked with her performing such tasks as the measuring and the installing of fabrics, picking up of furniture, delivering of furniture, upholstering of furniture, picking up and delivering of fabrics.
We are given some indication from the husband's uncontroverted testimony as to the purpose of having these separate accounts and as to some of the functions the husband performed in connection with his wife's jobs or customers:
"Q (By Mr. Maloney) All right, sir. The purpose, again, you say was to keep your earnings pretty much in this account Jerome and Lossie Steinhauer, and Lossie Steinhauer's earnings in her account, Steinhauer Interiors; is that correct?
"A What was the purpose of it?
"Q Yes.
"A So that there wouldn't be confusion between her jobs and my jobs.
"Q All right. Well, did you feel that she had any separate funds of her own at all, or did you feel that you had equal right to any proceeds that were put into the Steinhauer Interiors account?
"A Well, I had as much right in the Steinhauer Interiors account as she had because I had done work for her on her jobs. I done all different kinds of work for her on her jobs.

*828 "Q So you felt that that money was 
"A As much mine as it was hers.
"Q Okay.
"A Just like the money in my account was as much mine as it was hers. But she did help me on my jobs, too.
* * * * * *
"Q Tell the Court, please, about your participation in your wife's jobs. What did you do?
"A Well, from its inception, if it was a drapery job I sometimes went and picked up fabrics for her, depending on who was making the draperies. I sometimes took the materials to the place to make the draperies. I hung all of them. I hung traverse rods. I picked up furniture, delivered furniture, done the upholstery work, just about everything that I could do to expedite her jobs.
"Q Now, when you did this work did you ever submit a bill to your wife?
"A No, sir.
"Q Were you ever paid for the work you did on your wife's jobs?
"A. No, sir. I assumed it was a partnership and that when I worked for her she would work for me, and it would be evenly divided.
"Q Now, will you explain to the Court, please, how one account rather than another account was used for the purpose of paying regular bills?
"A It depended on which one had the most money, as to what bills would be paid.
"Q Does this explain why some bills were paid by you and some were paid by your wife?
"A That's correct.
"Q Out of different accounts?
"A Out of different accounts."
With particular regard to how the business was characterized the uncontroverted testimony of the husband indicated:
"Q (By Mr. Maloney) Now, sir, Steinhauer Interiors, is that a partnership?
"A Well, when a husband and wife are in business from 1947 on up to a few months ago, they both work in the business, there was never any record of anything made as a partnership or a corporation. We just worked with each other, for each other.
Would you call that a partnership? I would say so.
"Q The answer is yes?
"A Yes.
"Q Okay. Now, what was the division, or was there any division as to the profits of the partnership?
"A There was no division.
"Q How about for income tax purposes?
"A We both filed together, jointly."
With respect to the filing of a joint return the partnership return filed for the year 1968 indicated that the husband worked in the business only 20 per cent of the time. The uncontroverted testimony of the husband in explaining why the tax return showed his participation only 20 per cent of the time was:
"Q (By the Court) According to the partnership return, your wife devotes 100 percent of her time to Steinhauer Interiors and you devote 20 percent of your time?
"A I beg your pardon, sir? Who said that?
"Q That is what the tax return says. I want to know what you do with the other 80 percent of your time.
"A There's a misunderstanding then, sir. There's no truth in that at all.

*829 Now the tax return may say that that is supposedly 20 percent, but the reason for my putting on the tax return that amount toward her was because of her retirement for social security purposes, so that she would get her social security first, which she does because of her age. But we both devoted full time to the business. There's no such thing as 80/20. It was 50/50, or 100 and 100."
Again, under questioning from the court with respect to the husband's role in the business and the characterization of such business as a partnership, the following uncontroverted testimony of the husband reflects:
"Q (By the Court) Well, you had your jobs and she had her jobs?
"A That's correct.
"Q Under the name Steinhauer Interiors?
"A Yes, sir. It got so that we couldn't work together on the same job, planning it. There were differences of opinion, so we had to separate our customers where she had her customers and I had mine. And then I would go on her installations and pick-ups and deliveries to help her.
So I was devoting a lot of my time to her jobs, and then whatever time I could devote to my job, I would do.
"Q And you lumped these together under the partnership return; is that correct?
"A Yes, sir. It was a partnership. There was no difference of anything at all. This has not come up until I've left the house, that there was any difference at all. There's a witness outside, Mrs. Dilullo. She's a customer. She's an old customer. We've done about three houses for her and I've worked on every one of them, on every one of the jobs, put labor in it. My wife  it's her customer. And my wife planned the job and I done all the installation on the job."
The foregoing testimony demonstrates that both marital partners participated together during their twenty-five year marriage in a joint effort to develop a source of income to sustain the parties and their child during their lifetime together. The trial court, however, found that the wife possessed a special equity in the marital dwelling. This finding appears to have been based upon contributions made by the wife towards the purchase of their current (Tyler Street) home in early 1966. The record reflects that the husband and wife owned together by the entireties a home located at 1810 N.W. 94th Street (1810), and the wife owned, in her separate name, a home located at 1800 N.W. 94th Street (1800). The 1800 dwelling was rented out by the wife and the proceeds were used to pay the mortgage payments on the 1810 dwelling. Although the wife owned the 1800 dwelling, the record indicates that the husband helped in the actual construction of the 1800 dwelling. In 1966 both dwellings were sold. The wife realized a net gain of $8,184.95 from the 1800 dwelling and these proceeds were deposited in the "Steinhauer Interiors" account. The net proceeds of the sale of the 1810 dwelling were $10,178.39, and this was deposited in the "Jerome and Lossie Steinhauer" account. In February 1966 the parties purchased the Tyler Street home for $25,000.00. Approximately $2,500 was the down payment with $4,184.00 paid at the time of closing. Of this total cash payment of $6,684.00, some $4,600.00 came from the "Steinhauer Interiors" account and presumably the remaining $2,000.00 was drawn against the "Jerome and Lossie Steinhauer" account. All checks, however, were signed by the husband. In addition, the husband made a $9,000.00 payment from the "Jerome and Lossie Steinhauer" account in order to reduce the mortgage on the Tyler Street home. At the time of trial the mortgage balance was approximately $6,968.00, leaving an approximate equity of just over $18,000.00. The mortgage payments were made out of the "Steinhauer Interiors" account with the bulk of the checks being signed by *830 the husband during 1966, 1967 and 1968; the wife apparently began signing the checks sometime in 1968 and during 1969. It was during this latter period that the marital difficulties seemingly intensified. The record is not clear as to when the parties actually separated, although there is an indication that the husband ceased doing any more work in the interior design business in January of 1969.
Upon divorce the wife ordinarily becomes the owner of an undivided one-half interest as a tenant in common with the husband in land formerly owned by the spouses as an estate by the entirety. Hoke v. Hoke, Fla.App. 1967, 202 So.2d 118. See F.S. Section 689.15, F.S.A. However, upon proper pleadings and sufficient and proper proof, the husband's interest in the estate by the entireties can be awarded to the wife as lump sum alimony or to the extent that she establishes a special equity therein. Banfi v. Banfi, Fla.App. 1960, 123 So.2d 52; Wollman v. Wollman, Fla.App. 1970, 235 So.2d 315; Mays v. Mays, Fla. App. 1967, 203 So.2d 674.
In determining whether or not the award in question should be considered as lump sum alimony and deemed to have been properly made, the divorced wife's ability to be employed and earn a living, the needs of the wife and the children and the husband's capacity to meet such needs are all relevant material factors in determining the wife's need for alimony. McGarry v. McGarry, Fla.App. 1971, 247 So.2d 13; Brown v. Brown, Fla. 1965, 84 So.2d 311; Platt v. Platt, Fla.App. 1958, 103 So.2d 253; see also 10 Fla.Jur., Divorce, pp. 569-571. In the case sub judice, the court specifically found that the wife's income and assets presently exceeded those of the husband. It would appear therefore that the award of the entire one-half of the husband's interest in the marital domicile to the wife as "lump sum alimony" would not be consistent with the wife's financial situation.
With respect to whether the wife's contributions were of such a nature as to create a special equity in the marital dwelling, it is our opinion that the circumstances do not support such a determination. We are cognizant of the fact that the wife ran the business and perhaps through her ability and ingenuity the business thrived; we are not unmindful of the contributions made from the sale of her separately owned property towards the jointly owned dwelling. But we are equally not unmindful of the fact that the husband worked side by side with his wife over twenty years in building up the business; both parties seemingly considered their business relationship as a "partnership"; there was a continuous use of the funds of both accounts by the husband with the approval of the wife.
From the foregoing we are not convinced that the wife has established the burden of proof necessary to acquire a legal or equitable interest in the husband's property. Zuidhof v. Zuidhof, Fla.App. 1971, 242 So.2d 739. As Justice Adkins observed, "The unity concept of marriage has given way to the partner concept whereby a married woman stands as an equal to her husband in the eyes of the law." Gates v. Foley, Fla. 1971, 247 So.2d 40. In Gates, the Supreme Court of Florida determined that based upon recent changes in the legal and societal status of women in our society the wife would now be permitted to recover for the loss of her husband's companionship, affection, and sexual relationship (consortium).
As observed earlier, by operation of law each party is entitled to one-half interest in property held by the entireties, i.e., the marital dwelling, joint bank account, etc. This division is consistent with the partnership concept and gives true meaning to the equality of the status of women. As our Constitution states, "There shall be no distinction between married women and married men in the holding, control, disposition, or encumbering of their property, real or personal." Art. X, Sec. 5, Const. of Fla., F.S.A. In direct contrast *831 to the foregoing is the general proposition that a transfer of property from a husband to a wife (as joint tenants) is presumed to be a gift; whereas, a transfer from a wife to a husband (as joint tenants) of her separate property is not presumed to be a gift, the burden being on the husband to establish that fact. Olsen v. Olsen, Fla. App. 1967, 195 So.2d 864. This presumption is seemingly premised upon the inequality of the marital partners and the subservient status of the wife. We cannot accept the concept that a wife is anything less than an equal partner with the husband in the marital relationship. Our own Constitution and statutes place the woman on a status equal (not inferior) to the man. Of particular significance is the recent enactment of House Bill 17C which, in establishing a new state policy concerning dissolution of marriages, unmistakably places each marital partner on an equal footing.[1]
We do nothing but give lip service to the concept of unity and equality of the marital partners when at the outset we balance the scale in favor of one of the partners. Property or assets held by the entireties should be presumed to have been acquired by the joint efforts of both parties. The partners are deemed equal and are entitled to equality in treatment; but the facts of each marital situation are not the same and therefore we should seek to formulate a general rule that has as its cornerstone the equality of the parties and a presumption of an equal partnership; any unequal distribution ought to be made dependent upon a preponderance of the special fact circumstances of each case with the burden resting upon the person asserting a disproportionate distribution.
A jointly held domicile therefore ought to be divided equally between each partner with the wife's and husband's financial contributions to the acquisition of such property to be considered as gifts to each other. To establish a special equity, the wife's contributions must be shown to have been "above and beyond the performance of ordinary marital duties". See Eakin v. Eakin, Fla. 1958, 99 So.2d 854. A financial contribution by the wife should be interpreted as being within the realm of "ordinary marital duties" or a prima facie presumption of a gift. Such presumption must be considered to be a reciprocal presumption  each partner should be presumed to have made a gift to the other based upon the marital relationship.
The dissolution of the marital relationship is rarely without difficulty; it invariably has its share of physical, mental, parental and financial implications. We do little to minimize and mitigate these difficulties when we, without regard to the reciprocal relationship, "reward" one marital partner a greater interest in jointly held assets because that marital partner may have been a better bookkeeper and can better account for every dollar expended on behalf of the other partner. (See Zuidhof v. Zuidhof, supra.)
We are most reluctant to disturb a chancellor's determination on questions of alimony or special equity. We are, however, of the opinion that the evidence below does not support the award of the husband's interest in the marital domicile on the basis of a special equity or lump sum alimony. The rationale for the decision which we reach herein is well stated in the Gates case:
"The law is not static. It must keep pace with changes in our society, for the doctrine of stare decisis is not an iron mold which can never be changed. *832 Holmes, in his The Common Law (1881), p. 5, recognizes this in the following language:
`The customs, beliefs, or needs of a primitive time establish a rule or a formula. In the course of centuries the customs, belief, or necessity disappear, but the rule remains. The reason which gave rise to the rule has been forgotten, and ingenious minds set themselves to inquire how it is to be accounted for. Some ground of policy is thought of, which seems to explain it and to reconcile it with the present state of things; and then the rule adapts itself to the new reasons which have been found for it, and centers on a new career. The old form receives a new content, and in time even the form modifies itself to fit the meaning which it has received.'
"It may be argued that any change in this rule should come from the Legislature. No recitation of authority is needed to indicate that this Court has not been backward in overturning unsound precedent in the area of tort law. Legislative action could, of course, be taken, but we abdicate our own function, in a field peculiarly nonstatutory, when we refuse to reconsider an old and unsatisfactory court-made rule."
In this connection the following statement attributed to Chief Judge Fuld of the Court of Appeals of New York on re-examination of stare decisis is particularly pertinent:
"* * * If it is argued * * * that stare decisis compels us to perpetuate a rule  out of tune with the life around us, at variance with modern-day needs and with concepts of justice and fair dealing  a ready answer is at hand. The rule of stare decisis was intended not to effect a petrifying rigidity, but to assure the justice that flows from certainty and stability. If, instead, adherence to precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive and no principle constrains us to follow it."
We therefore reject a rule that would create a presumption of gift for one partner but not for the other in property held by the entireties. The partners are equal  the presumptions are equivalent. This conclusion should not be interpreted as precluding the establishment of a special equity where facts, circumstances and the application of equitable principles so require. In determining whether a special equity exists we hold that each party is entitled to the same presumptions with respect to their contributions to each other; and in particular regard to the facts of this case we find that the wife's contributions were not shown to have been "above and beyond the performance of ordinary marital duties".
It should be pointed out that the wife has retained and still continues to run the drapery business, the husband apparently having made no claim to it.[2] For that reason as well as the husband's current financial capabilities the trial court properly reserved jurisdiction for the award of alimony in the future should the circumstances justify such an award. We deem it not to be error either to have reserved jurisdiction or to have failed to have reserved jurisdiction for the award of alimony in the future. We are of the opinion that this determination rests within the sound judicial discretion of the chancellor as determined from all the facts and circumstances of the particular case. Pendleton v. Pendleton, Fla.App. 1966, 189 So.2d 499. See also Munger v. Munger, Fla., Fourth District Court of Appeal opinion filed April 30, 1971, 249 So.2d 772. We cannot categorically state as have our sister courts that it is error for the court not *833 to reserve jurisdiction to award alimony to the wife in the future. Dings v. Dings, Fla.App. 1964, 161 So.2d 227; Steele v. Steele, Fla.App. 1965, 177 So.2d 873; Reed v. Reed, Fla.App. 1971, 244 So.2d 449. The reservation of jurisdiction, we feel, ought to be made to depend upon the particular facts. The facts in the case sub judice support the trial court's reservation of jurisdiction and we find no abuse of discretion in this regard.
Accordingly, the judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further proceedings not inconsistent with this opinion. Nothing contained herein shall preclude the trial court from reviewing and revising the awards heretofore made to the wife inasmuch as such awards may have been gauged or influenced by the award of the entire marital dwelling to the wife.
CROSS and OWEN, JJ., concur.
NOTES
[1] For example, Section 9 of House Bill 17C, amending F.S. Section 61.071, F.S.A., permits either party to claim alimony pendente lite; Section 10, which amends F.S. Section 61.08, F.S.A., permits the court to grant alimony to either party; under Section 15, amending F.S. Section 61.13, F.S.A., both the father and the mother of the minor child are given the same consideration in determining custody.
[2] The record indicates that the husband is currently employed as a salesman for another business earning an average gross income of $160.00 per week. Part of this earning is based upon commissions.