267 So.2d 665 (1972)
Rebia Gladys SHARPE, Appellant,
v.
Alex Gainor SHARPE, Appellee.
No. 71-1050.
District Court of Appeal of Florida, Third District.
October 10, 1972.
*666 Edward P. Swan and Charnelle H. Summers, Jr., Miami, for appellant.
Morrow & Morrow and Steve G. Morrow, Jr., Miami, for appellee.
Before PEARSON and CHARLES A. CARROLL, JJ., and HOWELL, CHARLES COOK, Jr., Associate Judge.
HOWELL, Associate Judge.
This is a domestic relations case.
As sequelae of the parties' inability to perpetuate their once blissful life together, a suit for dissolution of the marriage eventuated; the judgment providing that the marital home should "be sold, at private sale, if possible, including the furnishings, carpets and draperies in the said house; excepting, however, the actual personal belongings of each of the parties. The proceeds of said sale, after the costs and expenses of said sale, be divided equally between the parties"  and the judgment likewise providing that "there will be no alimony granted to either of the parties as a result of the dissolution of this marriage."
Assigning both of the above stated provisions of the judgment as error, the wife appealed.
With professional sympathy we validate the appeal in each of its aspects.
Concerning the partition of the marital home we observe in limine that the complaint merely prays for "an equitable division of the property and other relief as is proper." Other courts than ours have "held that in the absence of an agreement of the parties or appropriate pleadings a chancellor is without authority to effect what might amount to a property settlement between parties to a divorce action and cannot dispose of the property belonging to the parties as an incident to the divorce." Rankin v. Rankin, Fla.App. 2, 1972, 258 So.2d 489, 490; continuing (p. 492) "that the chancellor ... erred in that part of the decree dividing the real and personal property held as tenants by the entireties"  it having already been observed that there was "a counterclaim asking for a partition of all the real and personal property held as an estate by the entireties". As recently as July 11, 1972, this Court, in Harder v. Harder, Fla.App. 3, 1972, 264 So.2d 476-477, approved and cited Rankin; observing that a "line of cases arises from F.S. § 689.15, F.S.A., wherein the last sentence provides: `... and in cases of estates by entirety, the tenants, upon divorce, shall become tenants in common.' The courts have stated that in the absence of an agreement between the parties or appropriate pleadings a chancellor is without authority to effect what might amount to a property settlement between the parties to a divorce action and cannot dispose of the property belonging to the parties as an incident to the divorce. Banfi v. Banfi, Fla.App. 1960, 123 So.2d 52; Latta v. Latta, Fla.App. 1960, 121 So.2d 42; Bell v. Bell, Fla.App. 1959, 112 So.2d 63. The courts have affirmed this rule in Rankin v. Rankin, Fla.App. 1972, 258 So.2d 489; Steinhauer v. Steinhauer, Fla.App. 1971, 252 So.2d 825; Massey v. Massey, Fla.App. 1967, 205 So.2d 1. By virtue of F.S. § 689.15, F.S.A. and Florida case law the property that had been owned jointly by the husband and wife as tenants of an estate by the entirety during marriage, automatically became owned by the parties after divorce as tenants in common. Sistrunk v. Sistrunk, Fla.App. 1970, 235 So.2d 53. The decree appealed by the wife concerning her conveyance of all right, title and interest in all her property other than the marital home is reversed since this would amount to an unlawful property settlement by the chancellor."
Deploring the conscientiously inspired necessity of being out of judicial rapport in this particular instance with such an *667 outstanding chancellor as the one below, it is consequently with no light heart at all that we similarly are unable to agree, insofar as the wife is concerned, with his decision that "there will be no alimony[1] granted to either of the parties as a result of the dissolution of this marriage." Because still it is, and not withstanding the new dissolution of marriage, or "no-fault divorce" act (Sec. 61.001, F.S.A. et seq.), and the significant changes it has wrought, that, "in general ... the primary criteria to be used in establishing the amount of alimony is the husband's ability to pay as above described, and the needs of the wife, taking into consideration the standard of living shared by the parties to the marriage." Firestone v. Firestone, Fla., 1972, 263 So.2d 223, 226.
This husband is fortunately able to pay. From a gross of $880.00 per month he nets as take home pay $596.62 monthly. Adding to this amount his $275.00 pension received each month, we find him possessed of total monthly monies at his disposal of $871.62. Taking from this the $515.00 of his required monthly living and other expenditures leaves him $356.62 to apply to the support of his wife, if she needs it. We think that she does, to the approximate extent of $25.00 weekly, or $108.00 each month.[2] That sum, subtracted from the *668 $356.62 aforesaid, still leaves the husband a margin of $248.62 every thirty days to spend as he wishes; save; or invest.
Now to the needs of the wife. They are said by her to be $550.00 monthly; an amount admittedly in excess of the husband's like requirements, but probably so because of the poor health from which the wife is suffering in the guise of "an infection of the urine tract" for which she is apparently constantly "taking medication".
Nor can we blind ourselves to the realities of the broad, overall equitable picture. For almost a quarter of a century, for 24 years to be exact, this couple had lived together as man and wife; and the picture, then, "is not to be confused with the `marry in June and sue the following September' situation which would require an entirely different analysis ...", Firestone, 263 So.2d 228. "In this cause", as in Posner v. Posner, Fla. 1972, 257 So.2d 530, 537, "the parties had been married for a substantial period of time and she had borne him 2 children". Since the wife filed the instant suit, and the record is otherwise silent on the point, we must presume that the wife, again as in Posner, was "dutiful and faithful ... and, therefore, this case is not to be confused with a situation ofttimes appearing where there is a short courtship, short marriage and an effort to obtain a lifetime of independence from a shipwrecked marriage."
No. Eight years before the marriage dissolution the wife had held not one, but two, part time jobs, although it is extemely doubtful that either was a very remunerative post. "I washed dishes for Dade County School and I worked in a paint roller factory ... I assembled paint rollers", she said, for "2 or 3 years. I am not positive." However it was the husband that "demanded I quit. He said a woman should be in the home with her children,[3] and that is what I did." Thus it is that, now, it would not be easy for this one-time Juliet (the husband married her when she was, as Shakespeare's heroine, but 14 years of age; and doubtless he had, at least somewhere along the way, thought of her as Romeo did of his beloved when he spoke those imperishable lines, "But soft! What light through yonder window breaks? It is the east, and Juliet is the sun!" Romeo and Juliet, Act II, Scene II.) to obtain employment, the returns from which would wholly meet her unavoidable expenses of simply living. She didn't finish even the seventh grade in grammar school; and small wonder is it, therefore, that she had such scant business acumen and economic grasp of practical realities, that between March 23, 1971, when the husband moved out of their house, and the August 24, 1971, taking of testimony in her instant divorce action, she had expended about $3,000.00 ($600.00 a month) of the savings and certificates jointly owned by her husband and her but which, presumably "pursuant to the court's order", were "in her care, custody, and control", and for which she kept "a monthly account of all monies expended ... during this period of time, from the time of the temporary hearing until today's date." As it was, and with the single exception of having neglected to apply to Florida State Employment Service because, "to be truthful," she "hadn't thought of it. I never was allowed to think on these terms", the wife has exerted all reasonable efforts to secure employment subsequent to the separation. She took a typing course which she "just didn't finish" because she could manage only 12 words a minute. Then she unsuccessfully applied for work at a bank in Hialeah, another in Miami Springs; and she tried to gain employment at such stores as Jackson's and K-Mart, together with "an insurance company" of unknown name. She has responded without success to the want ads. Such work as she has been able to obtain is "just baby sitting here and there." The balance of *669 the settlement monies (after retiring the mortgage on the home) "went to pay for the expenses of the doctors' fees, hospital and attorneys ... ... plus carpet and things we needed around the home". When asked, "Everything you have you contributed to the family?", the reply was, "Yes." Now that she is divorced she is no longer entitled to hospitalization benefits under her former husband's policies  nor to their major medical coverage. Such would cost her some $228.00 annually.
Since, therefore, the "basic nature and purpose" of alimony is "to provide nourishment, sustenance and the necessities of life to a former spouse who has neither the resources nor ability to be self-sustaining", Lefler, supra, n. 1, it does seem to this Court that some financial assistance each week to one in the position of this lady is in high order, consonant with the dictates of equity and good conscience, and entirely consistent with well recognized principles in this area of law. In other words, "we do hold that in view of the (husband's financial capabilities)[4] and the established needs of the appellant the (failure to allow her any alimony at all) was not proper under the established guidelines. An appellate court will not interfere in the determination of the amount of alimony in the absence of a clear showing of an abuse of discretion. Singer v. Singer, Fla.App. 1972, 3rd D.C.A., 262 So.2d 731, filed May 30, 1972; Mufson v. Mufson, Fla.App. 1971, 245 So.2d 110; Tomaino v. Martz, Fla.App. 1965, 170 So.2d 468. However, we think that such a showing appears upon the undisputed facts of this record. Cf. Preston v. Preston, Fla. App. 1968, 216 So.2d 31; Massey v. Massey, Fla.App. 1967, 205 So.2d 1; Klein v. Klein, Fla.App. 1960, 122 So.2d 205. The record establishes that appellant's needs demand (at least something in the way of alimony). The appellee has the ability to respond to these needs. Chastain v. Chastain, Fla. 1954, 73 So.2d 66; Sommers v. Sommers, Fla.App. 1966, 183 So.2d 744; Platt v. Platt, Fla.App. 1958, 103 So.2d 253. When a marriage is dissolved, it is the duty of the husband to provide for his divorced wife within the limits of her needs, his financial ability, and the standards established by himself during the marriage. Preston v. Preston, supra; Som supra (sic). See also Farbman v. Farbman, Fla. App. 1968, 208 So.2d 648; Parker v. Parker, Fla.App. 1966, 182 So.2d 498. Under the circumstances of a given case, a failure to follow the guidelines in determining the amount of alimony may amount to an abuse of discretion by the trial judge." Royal v. Royal, Fla.App. 3, 1972, 263 So.2d 277, 279.
[4] The parentheses inserts in this and the final paragraph of the opinion are ours.
That happened, we are ruefully persuaded, here.
Accordingly, in the language of Royal, and "in order to prevent unnecessary court proceedings in this matter, we reverse the (September 2, 1971, judgment of dissolution of marriage) and direct the trial court to execute an amended final judgment providing for the payment of (reasonable and appropriate) alimony. The amended judgment shall provide for the alimony accrued from the date of the judgment appealed, and shall provide for the payment of arrearages within a reasonable time to be set by the trial court." Said amended judgment shall likewise omit paragraph 4 of the original one, ordering the sale of the home[5] and equal division of the proceeds of such sale.
Reversed.
NOTES
[1] The isolated term "alimony", of course, is broad enough to include the "special equity or lump sum award of alimony of the husband's interest in and to the marital home" to which the wife lays claim as Point III in her brief in chief; but this time we cannot follow her. We find no special equity inuring to the wife's benefit here. She has enjoyed the benefit of living in the parties' home for 20 years. And while it is true that she contributed $4,000.00 of her personal injury settlement award in paying off the house mortgage, that was back in 1965, approximately 6 years before her complaint for divorce was launched; in an era when she and the husband both were as joint laborers in the domestic vineyards, teaming together as one in a "cause" for which "a man" shall "leave father and mother, and shall cleave to his wife: and they twain shall be one flesh", Matthew 19:5; a payment on her part, therefore, which, under the circumstances, could hardly be regarded as "`above and beyond the performance of ordinary marital duties.' See Eakin v. Eakin, Fla. 1958, 99 So.2d 854. A financial contribution by the wife should be interpreted as being within the realm of `ordinary marital duties' or a prima facie presumption of a gift. Such presumption must be considered to be a reciprocal presumption  each partner should be presumed to have made a gift to the other based upon the marital relationship." So spoke the Court in Steinhauer v. Steinhauer, Fla.App. 4, 1971, 252 So.2d 825, 831, after having commented that "we do nothing but give lip service to the concept of unity and equality of the martial partners when at the outset we balance the scale in favor of one of the partners. Property or estates held by the entireties should be presumed to have been acquired by the joint efforts of both parties." Also it is deserving of comment that during the six months of March through August, both inclusive, of 1971, immediately prior to this matrimonial schism, the husband had, each month, set over unto the wife the $30.00 received on a certain mortgage held by the parties. It was in Singer v. Singer, Fla.App. 3, 1972, 262 So.2d 731, 732, that we said "the burden of proof is upon the wife to sustain a special equity and to establish the same to the exclusion of a reasonable doubt that she had acquired either a legal or equitable interest in the property." Perhaps worthy of note is Lefler v. Lefler, Fla.App. 4, 1972, 264 So.2d 112, 114; where no special equity was shown justifying a lump sum alimony award although the opposing spouse had "contributed none of the original purchase price" of the marital domicile and the party laying claim to such equity and alimony "had been paying the bills and `keeping things going."
[2] From the transcript it is evident that, proving the husband's fiscal capabilities as a practical matter, he has been paying the wife in the neghborhood of $100.00 monthly since their separation; and, frankly, we would respectfully direct the entrance of an amended judgment awarding alimony to the wife in this amount, under erstwhile Sec. 59.34, F.S.A., which, in part, authorized "the court, on an appeal", to "give such judgment, sentence, or decree as the court below should have given;" but this provision of the statutes has been repealed by Chapter 71-316, Sec. 5, Laws of Florida, effective September 1, 1971.
[3] Both of whom were emancipated when the petition for dissolution of the marriage was filed.
[5] And so "title to the" property will be "controlled by statute, F.S. Section 689.15, F.S.A." Cribb v. Cribb, Fla.App. 4, 1972, 261 So.2d 566, 567.