GEORGE W. MANN, JR., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1595–77.     Filed September 15, 1980.

*Joseph D. Edwards* and *Michel G. Emmanuel*, for the petitioner.

*Stuart B. Kalb*, for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency in petitioner's income tax of $9,377 in the taxable year 1973 and of $3,491 in the taxable year 1974.

Due to a concession by petitioner, the only issue remaining for our decision is whether payments from petitioner to his former wife during 1973 and 1974, pursuant to a final judgment of divorce in 1972, are deductible either as alimony under section 215[1] or as ordinary and necessary business expenses under section 162.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioner George W. Mann filed his Federal income tax returns for the calendar years 1973 and 1974 with the Internal Revenue Service Center at Chamblee, Ga. At the time he filed his petition herein, petitioner resided in Winter Haven, Fla.

Petitioner and Frances Mann (hereafter Frances) were married on February 21, 1933. When they were first married, they lived in a ranchhouse on property owned by petitioner's father near the Kissimmee River in Osceola County, Fla. After living at that ranchhouse for about 12 months, they moved to Bartow, Fla., where they periodically rented a house and/or lived with petitioner's parents. During this period of time, petitioner worked for his father on several thousand acres of ranchland owned by his father in Osceola County, Fla.

At the time of his father's death on May 7, 1935, petitioner came into possession of two groves (known as the Hesperdes and Sand Lake Groves) and several hundred head of cattle which had been acquired in his name some time before. Petitioner sold the two groves shortly thereafter. On April 20, 1936, petitioner used part of the sales proceeds from one of the groves to purchase a house in joint title with his wife and himself in Bartow, Fla. The home was located in a residential neighborhood and had approximately 3,000 to 3,300 square feet. Petitioner and his wife lived in this home until spring 1971 when they moved to a new

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect during the taxable years in issue.

home in Dundee, Fla. The Bartow home was still owned by petitioner and Frances after they moved, however, and was the only property held by petitioner and Frances in joint name.

When petitioner's father died, his mother became the owner of the cattle, farming equipment, and several thousand acres of ranchland which had been owned by petitioner's father. Petitioner, his sister (Roberta), and his mother then formed a partnership known as the G. W. Mann Ranch to conduct the ranching operations. Petitioner became the managing partner and was responsible for all cattle operations. Petitioner's cattle and that of his sister were run together with the cattle owned by petitioner's mother on the mother's property. All profits and losses from the ranching operations were divided among the respective partners but petitioner received, in addition to his respective share of profits, a "salary" for managing cattle operations.

In about 1937, petitioner, his mother, and sister acquired approximately 5,000 acres of property adjacent to the G. W. Mann Ranch land known as Knight's pasture. This additional property was placed in the names of petitioner, his mother, and sister and was owned by them in the same proportions that they shared in the partnership's profits and losses.

In about 1940, petitioner, his mother, and sister formed the Osceola Land & Pasture Co., Inc. (hereafter Land & Pasture). Land & Pasture then purchased approximately 19,900 acres of land adjacent to Knight's pasture in Osceola County which was used by G. W. Mann Ranch to graze cattle.

The next year, petitioner's mother gave her interest in the Knight's pasture property to petitioner and his sister, equally; thereafter, petitioner and his sister owned the 5,000 acres of land in equal shares. Also in 1941, petitioner's mother gave petitioner and his sister approximately 436 acres of land in Osceola County known as the Lake Marion Property.

In 1942, petitioner purchased an additional 640-acre section of land adjacent to the G. W. Mann Ranch land on behalf of the G. W. Mann Ranch partnership.

In about 1952, Land & Pasture was liquidated and the land was distributed to petitioner, his sister, and his mother. In 1955, petitioner's mother gave her interest in this land to petitioner and his sister. Thereafter, petitioner and his sister owned the 19,900 acres jointly.

On January 13, 1959, petitioner, his mother, and his sister sold the G. W. Mann Ranch land, Knight's Pasture, the 19,900 acres originally purchased by Land & Pasture, and the 640 acres purchased in 1942 for the Three Lakes Ranch, Inc., for $2,200,000. G. W. Mann Ranch then leased back all of the property it sold for a period of 5 years and continued to run cattle on it under petitioner's supervision. Petitioner's share, after deducting all costs of sale, was $578,161.42. Petitioner deposited in an account maintained in his name with the Fiduciary Trust Co. of New York approximately $400,000 of his share of the sales proceeds.

After the sale, petitioner purchased approximately 40 acres of grove land in Hardee County, Fla., for $16,400. During 1960 and 1961, he and his sister spent approximately $20,000 in planting groves on the Lake Marion property. At approximately the same time, other groves were planted on the 40 acres in Hardee County, Fla.

Between 1960 and 1967, G. W. Mann Ranch and Marion Groves (a partnership which had been formed between petitioner and his sister) raised cattle on pasture land owned individually by the Marion Groves' partners or leased from third parties. After 1967, Marion Groves no longer raised cattle, and its activities were limited to the production and sale of citrus fruit from the Lake Marion property.

In 1963, petitioner withdrew a portion of his funds from the Fiduciary Trust Co. and purchased 1,200 acres of land near Dundee, Fla., in Polk County. Petitioner and his sister owned land in Polk County adjacent to the 1,200 acres prior to the purchase.

Between 1959 and 1965, petitioner's mother gave petitioner 1,171 head of cattle, thereby increasing the herd he had already established. Petitioner's cattle were maintained on the Polk County land and on various pastures which he had leased.

In 1964 or 1965 (in anticipation of the termination of the lease with the Three Lakes Ranch, Inc., obtained after the January 13, 1959, sale), G. W. Mann Ranch, under petitioner's active supervision, moved its cattle to other pastures owned or leased by the individual partners.

During the latter part of the 1960's, G. W. Mann Ranch was phased out of business, and petitioner and his sister formed a

temporary partnership. After that partnership was dissolved, petitioner operated his own cattle ranch business.

After the death of petitioner's father in 1935, and continuing throughout the marriage, the business operation of the ranch was handled at petitioner's and Frances' home. Business supplies (such as nails, staples, medicine, lumber, pipes, etc.) were delivered to and picked up from the house. Business conferences were held at their home. The telephone number and address of the business were the same as petitioner's and Frances' personal telephone number and home address. All business mail and telephone calls came to the house, and Frances constantly and regularly took business telephone messages. Petitioner expected her to perform this service. Typically, Frances would take the call, write down who was calling, the time, and the message. If the message was important, Frances tried to contact petitioner. At times, Frances was placed in a situation in which she had to stay home at petitioner's request in order to receive a particular telephone message. Moreover, business telephone messages did not come in only during normal working hours. When petitioner was out of town, Frances would attempt to solve any problem that arose. Sometimes this involved travel on her part.

Frances did most of the cooking for the family but the ranch had a full-time cook. Often, however, ranch employees would eat with the Mann family and would sometimes stay overnight. After 1968, Frances began buying groceries and cooking in large quantities for use at the ranch. Frances frequently cooked dinner for business associates at home. She also occasionally cooked for cattle buyers, ranch employees, veterinarians, and mechanics at home or at cow camps on the ranch. The Manns butchered their own ranch cattle for the meat consumed by the employees. Frances would direct how she wanted the cattle cut up, and when the cattle was slaughtered at a location on the ranch where there were no freezing facilities, she waited until the meat was packaged so that she could bring it home and put in their home freezer.

In 1941, petitioner became very ill and had to have an operation on his tonsils and adenoids. Apparently, there were complications and petitioner almost bled to death. When he returned home, he was not able to attend to the operation of the ranch as he had previously done and insisted that Frances be with him constantly. She traveled with him on out-of-town

buying trips, and accompanied him to business conferences, meetings, and cattle sales, among other things. This situation lasted until the G. W. Mann Ranch was sold in 1959.

Frances also drove a truck to aid in the feeding of cattle pellets to the cattle. On one occasion, Frances was sent by petitioner to purchase a bull at an auction. On another occasion, she had to travel to another town to guarantee payment of a medical bill of one of the ranch's employees who was ill at the time. She once had to attend a reception for the county agriculture agent as a representative of the ranch when petitioner was out of town.

During the first years of the marriage, Frances wrote the checks for the business bills although a bookkeeper actually maintained the checkbook. In 1941, the bookkeeper apparently began writing the ranch's checks, but Frances had to transport the checkbook to the bookkeeper when needed. Also, Frances periodically helped petitioner keep the records on purebred cattle which the ranch was breeding. Prior to petitioner's father's death, Frances occasionally drove his father to the pastures to check on the steers. She also rode with the cattle crew during cattle drives when she and petitioner were first married.

Frances sometimes had to travel to the bus station to pick up parcels and to the town hardware store or various other towns to pick up supplies. When she and petitioner stayed at one of the cow camps on the ranch for a long period of time, she would return to the house to pick up the payroll or mail. Also, if petitioner's mobile phone broke down while they were at the cow camps, a not infrequent occurrence, Frances would go home to make phone calls for petitioner. Frances did not own any assets nor was she gainfully employed at the time she married petitioner. She was never employed outside petitioner's cattle business during the marriage, and the only salary she ever received during the marriage was during an 80-day period during mid-to-late 1960 in which she worked as a cook for the partnership while G. W. Mann was being dissolved.

On January 27, 1972, petitioner filed a petition for dissolution of marriage against Frances. Frances filed a response to petition in which she asked for the following relief:

13. At the time of the marriage of the parties in 1933, the husband's means consisted of a second hand automobile and a few cows in his father's pasture,

and his only means and income was such allowance, without fixed salary, as given to him by his father for approximately three years, and two citrus groves operating on little profit, which was sold after about four years. From the time of their marriage until approximately three years ago all the business transactions of the husband was channeled through the marital home and the wife did such chores to assist her husband as taking and making telephone calls, sleeping and feeding ranch hands in the home, and she frequently went to cow camps and cooked for cow hands numbering two to fourteen at the time; initially cow camps were without lights and running water, and the first two homes of the parties had no running water and no sanitary facilities, and from the year 1941 when the husband had a serious and critical sickness and operation the husband would not go any place about his business and pleasure without his wife and to accommodate him and comply with his wishes she would take her nursing child to go with him to see about his business and cattle operations. To and until the separation of the parties the wife tended the detail of all manner of telephone calls of a business nature and their home was used as the business phone and address in Bartow, Florida.

14. Throughout their marriage the wife, in addition to her household and housekeeping efforts, in addition to rocking the cradle and raising three fine children, she continuously contributed her efforts in aiding her husband in his business affairs and the development of his business and to encourage him in his cattle and farming operations. The marital home in Bartow, Florida, acquired in 1936 was almost totally neglected for upkeep and repairs over the past ten years, as the husband and wife planned to build a new marital home at the cattle ranch near Dundee, Florida. By reason of the wife's long years of performing her chores in and about her husband's business and farming, in addition to her wifely duties in and about the home, the husband has accumulated an estate in his own individual name far in excess of two million dollars in property and liquid assets and the only item of property that bears her name is a joint interest in a frame house and furniture purchased in 1936 and the frame house is now 47 years old and in a poor state of repair.

15. The wife's health is not good and she has an arthritic condition of her left hand and has no occupational training or experience and she is without adequate means with which to support herself and she is also without adequate means with which to pay her attorney a reasonable attorney's fee to defend herself against the husband's petition, and to prosecute this counter petition.

16. The marital home situated near Dundee, Florida, was constructed in the Spring of 1971, after years of planning by the husband and wife and costing in excess of $50,000.00, and the wife needs the same for shelter for herself to maintain herself in keeping with their station in life. The wife needs transportation for herself and she needs the use of the Chrysler sedan customarily used by her which is owned in the individual name of the husband, together with suitable moneys to operate the same and for any replacement thereof.

WHEREFORE, The counter-petitioner prays that the court deny the husband's petition for dissolution of marriage and grant unto her separate maintenance and support and require the husband to pay to her support money, the use and occupancy of the marital home, the use of the automobile customarily used by her and adequate allowances for its operation, maintenance, replacement and

the like, or in the alternative in the event the marriage between the parties is dissolved then the court grant unto her support money in such amounts as to provide her with suitable living and security to maintain herself in the society and means in keeping with their station in life, and such additional and further awards in property and property rights accumulated by the husband over the 39 years of their marriage, and in keeping with her loss of rights of inheritance and dower as the surviving spouse of her husband; and that the court grant unto her temporary and permanent attorney's fees with which to pay her attorney and court costs in and about these proceedings.

During the divorce proceedings, both petitioner and Frances filed financial statements with the Circuit Court. Petitioner's valuation of his assets was based upon his own knowledge. The cost of his assets was listed as $463,281. Frances' financial statement was only an estimate of her desired alimony based upon her expected expenses but did not reflect her actual costs, except for a $74.45 monthly dental bill which she did not anticipate having to pay in the years to come. It was prepared with her attorney's advice, and Frances had little to do with her estimated expenses. Her total monthly expenses were estimated to be $2,453.78.[2]

---

[2]

| | |
|---|---:|
| Rent, house payments | $350.00 |
| Food | 250.00 |
| Clothing | 150.00 |
| Incidentals | 42.00 |
| Medical and dental | 10.00 |
| Transportation | 135.00 |
| Recreation and club | 92.50 |
| Insurance and maintenance | 80.00 |
| Taxes—property | 40.00 |
| Light, gas, telephone | 95.00 |

*Payments on bills:*

| | |
|---|---:|
| Income tax; $7,000 per yr | 583.33 |
| Auto insurance; $162 per yr | 16.50 |
| House insurance; $110 per yr | 10.00 |
| Hospital insurance; $231 per yr | 20.00 |
| Furniture and furnishings | 200.00 |
| Vacation | 100.00 |
| Church affiliation | 100.00 |
| Gifts and amenities | 30.00 |
| Dentist $893; Dr. Cruse, D.D.S | 74.45 |
| Yard care | 50.00 |
| Laundry | 18.00 |
| Total expenses | [1]2,453.78 |

---

[1] Frances showed total expenses of $2,453.78 but this was apparently due to a mathematical error. The correct figure is $2,446.78, but for purposes of consistency, the $2,453.78 amount will be used in this opinion.

Immediately after the final hearing in the divorce proceedings, the presiding judge asked for a memorandum brief on the relief sought by each party and on the law regarding a wife's equity in her husband's property. Frances' brief (prepared by her attorney) submitted to the court dealt with a wife's special equity in her husband's property and requested the following relief: (1) Alimony in an amount upwards of $1,000 per month after income tax; (2) equitable interest of the wife in and to the admitted assets of the husband in an amount of one-third interest therein; (3) her personal property remaining in the "new home"; and (4) attorney's fees and suit costs, with attorney's fees fixed upon quality of services and not upon fixed minimum ethical charges for discipline of attorneys who would charge less.

On June 16, 1971, petitioner and Frances were divorced by a final judgement of the Circuit Court for the Tenth Judicial Circuit in and for Polk County, Fla. Petitioner and Frances did not enter a property settlement agreement with respect to the divorce. In pertinent part, the judgment stated as follows:

> Petitioner admits having assets of $1,157,469 which amount, the Court finds to be conservative. These assets consist of cash, and some citrus groves, but primarily from owning a ranch, several thousand head of cattle, and pasturing cattle on approximately 45,000 acres of pasture land.
>
> Although the Court finds that the respondent wife by her efforts has contributed to the accumulation of and increasing the petitioner's estate, she is not equipped to be a rancher, and to award her an interest or pecentage in the groves, cattle and/or pasture lands would not be in the best interest of either party. The Court cannot in good conscience limit the relief of the respondent wife to monthly alimony payments that would terminate upon petitioner's death. Therefore, the compensation for her special equity in the petitioner's estate must be in money.
>
> After carefully considering all evidence, testimony, exhibits and argument of counsel, it is,
>
> ORDERED AND ADJUDGED AS FOLLOWS:
>
> (a) That the marriage between George William Mann, Jr., and Frances Ellen Mann is irretrievably broken and the same is hereby dissolved;
>
> (b) That Frances Ellen Mann is hereby awarded, as a special equity for her contribution to her husband's estate, the sum of $150,000.00. The petitioner is directed to pay said $150,000.00 as follows:
>
> (1) $25,000.00 within five days from the date of this judgment,
>
> (2) $125,000.00 in annual installments of $7,500 beginning July 1, 1973, and

on the first day of July of each year thereafter until the said $125,000.00 is paid in full.

(c) That as a partial lump sum alimony, the respondent is awarded all of the right, title and interest of the petitioner in and to the old home place [Bartow home] and all the furniture, fixtures and equipments therein, * * * . The petitioner is hereby directed to convey to the respondent all of his right, title and interest to said property within three days of the date of this judgment, otherwise this judgment shall operate as a conveyance of his interest therein to the said respondent, Frances Ellen Mann.

In addition to said real estate and the marital home and the contents therein, the petitioner is directed to convey to the respondent all of his right, title and interest in and to the Chrysler automobile now in her possession.

(d) That the respondent is further awarded the sum of $626.00 per month as periodic alimony, the first payment to be made on Juy 1, 1972, and a like amount of $626.00 per month to be paid on the first day of each and every month thereafter until further order of the Court.

The final judgment of the Circuit Court was affirmed per curiam by the Second District Court of Appeals in Florida, *Mann v. Mann,* 275 So. 2d 625 (Fla. Dist. Ct. App. 1973).

The $625 monthly alimony is used by Frances for all of her ordinary living expenses. Improvements to her home, furniture, and furnishings are paid from her capital.

After the divorce, a dispute arose over whether the special equity payments made pursuant to the final judgment drew interest at the statutory rate. Petitioner filed a petition for clarification of final judgment with the court. Frances' attorney filed a response to the petition, and a hearing was held. The judge ruled that interest was payable.

On his tax returns for 1973 and 1974, petitioner claimed deductions for alimony in the amounts of $22,512 and $15,021, respectively. These amounts were computed as follows:

|  | *1973* | *1974* |
|---|---|---|
| Periodic alimony payments ($626 per month for 12 months) | $7,512 | $7,512 |
| "Special equity" payments pursuant to paragraph (a) of the final judgment | 15,000 | 7,500 |
| Alimony deduction claimed | 22,512 | 15,012 |

Respondent determined that for 1973 petitioner made 11 monthly periodic alimony payments of $626 and 1 periodic alimony payment of $276 to Frances pursuant to paragraph (d) of the final judgment. Respondent also determined that for 1974, petitioner made 12 monthly periodic alimony payments of

$626 pursuant to paragraph (d) of the final judgment. Consequently, respondent allowed an alimony deduction of $7,162 for 1973 and $7,512 for 1974. No alimony deduction was allowed for the $15,000 paid in 1973 or the $7,500 paid in 1974 relating to the "special equity" of paragraph (b) of the final judgment. Petitioner disagrees with this disallowance.

## OPINION

The first issue which we must decide is whether the amounts paid by petitioner in 1973 and 1974 as "special equity" under the final judgment of the Florida court constitute alimony. Section 215 provides that a husband shall be allowed a deduction for amounts includable under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. Where a divorce decree orders a principal sum to be paid in installments which extend over a period in excess of 10 years in satisfaction of an obligation to support, section 71 requires the former wife to report the lesser of an amount equal to 10 percent of the principal sum or the amount of payment as taxable income. If, however, the payments by the former husband are made in satisfaction of her property rights, then the payments are not taxable as alimony regardless of the payment period. *Mirsky v. Commissioner*, 56 T.C. 664, 672 (1971); *Price v. Commissioner*, 49 T.C. 676 (1968); *Newbury v. Commissioner*, 46 T.C. 690 (1966). Whether a payment is part of a property settlement or constitutes alimony is essentially a question of fact. *Sydnes v. Commissioner*, 68 T.C. 170 (1977), revd. on other grounds 577 F.2d 60 (8th Cir. 1978).

Florida law provides that if a wife has contributed materially to the husband's acquisition of property by her personal services, she acquires a special equity in her husband's business. *Tanner v. Tanner*, 194 So. 2d 702 (Fla. Dist. Ct. App. 1967); *Roberts v. Roberts*, 101 So. 2d 884 (Fla. Dist. Ct. App. 1958). A special equity is, therefore, a vested equitable property right. *Bosch v. United States*, 590 F.2d 165 (5th Cir. 1979); *Heath v. Heath*, 103 Fla. 1071, 138 So. 796 (1932). An award in recognition of this right is not alimony nor dependent upon the right to recover alimony under Florida law. *Eakin v. Eakin*, 99 So. 2d 854 (Fla. 1958).

Both parties agree that an award for this type of special equity does not constitute alimony for purposes of section 71.

Petitioner argues that Frances had no property interest in his assets because she did not materially contribute to his estate.[3] Rather, it is his contention that there is a second kind of special equity recognized under Florida law based upon the duration of the marriage and on the parties' relative financial positions at the time of divorce, and it is this second type of special equity which is referred to in the divorce decree.

Respondent argues in response that there are not two kinds of special equities under Florida law. We agree with resondent. What petitioner calls the second type of special equity is actually lump-sum alimony. Lump-sum alimony as defined under Florida law is essentially the payment of a definite sum (which may be paid in installments). Hence, an award of lump-sum alimony creates a vested right which survives death and which is not modifiable nor terminable upon the divorced wife's remarriage. It is justified only where it serves a reasonable purpose or where the marriage's duration or the parties' financial position would make an award advantageous to both. The wife's needs and the husband's ability to pay form the basis of the amount of award. Furthermore, lump-sum alimony may be awarded "only where special equities require it or make it advisable." *Cann v. Cann,* 334 So. 2d 325, 328 (Fla. Dist. App. 1976). See also *Storer v. Storer,* 353 So. 2d 152 (Fla. Dist. Ct. App. 1977), rehearing denied Jan. 5, 1978. The requirement that lump-sum alimony be based upon special equities must not be confused, however, with an award in a dissolution of marriage action to a spouse who has acquired a special equity in property accumulated during the marriage. *Cann v. Cann, supra.*

While respondent is correct that there are not two types of special equities under Florida law, we do not believe this of itself refutes petitioner's contention that when the Florida court awarded special equity in the decree that it meant to refer to the special equities in Frances' favor that would justify an award of lump-sum alimony rather than a special equity in petitioner's property. It does, nonetheless, strongly weigh against petitioner since the term has a particular meaning under Florida law. This

---

[3] A special equity may also be awarded where a wife contributes financially to the husband's business. *Tanner v. Tanner,* 194 So. 2d 702 (Fla. Dist. Ct. App. 1967); *Roberts v. Roberts,* 101 So. 2d 884 (Fla. Dist. Ct. App. 1958). The record is clear that Frances did not make any financial contributions to petitioner's business nor does respondent so contend.

is especially so since the court specifically referred to lump-sum alimony in its award of the Bartow home and automobile. Therefore, it appears to us that when the court wanted to refer to lump-sum alimony it did so.

Additionally, the court specifically directed the parties to prepare memorandum briefs on the relief sought by each party and on the law regarding a wife's equity in her husband's property. Frances' brief dealt with a wife's special equity and asked for a one-third interest in petitioner's assets as her share of his property.

In awarding Frances special equity, the court found that she had "contributed to the accumulation of and increasing [petitioner's] estate." Further finding that Frances was "not equipped to be a rancher" the court held that it would not be in the best interest of either party to award her an interest in the business. Therefore, "the compensation for her special equity in [petitioner's] estate must be in money." A special equity, as we noted earlier, is a property right in the husband's property or business. There would appear to be no reason why the court would have to award Frances an interest in the business (or money in lieu thereof) in order to grant her lump-sum alimony. Moreover, that Frances was "not equipped to be a rancher" does not show, as petitioner argues, that her services were not substantial. Although it is clear that her work was not as extensive as petitioner's, it does not follow that her efforts did not contribute materially to petitioner's estate.

Based upon the foregoing analysis, we cannot discern in the court's order an intent in its reference to special equity to mean lump-sum alimony. Accordingly, we hold that the Florida court awarded Frances $150,000 as her property interest in petitioner's estate.

Petitioner argues, in the alternative, that since labels attached to payments made in connection with divorces or separations are not controlling, (*Capodanno v. Commissioner*, 69 T.C. 638 (1978), affd. 602 F.2d 64 (3d Cir. 1979), *Mirsky v. Commissioner, supra*, and cases cited therein), regardless of the Florida court's decision, this Court may make an independent inquiry into the question of whether Frances had a special equity and whether the payments intended to effect a property settlement. See *Soltermann v. United States*, 272 F.2d 387 (9th Cir. 1959). Petitioner notes this is especially true where a term used by a

court in directing the award can embrace both payments in settlement of property rights as well as payments for support. *Mirsky v. Commissioner, supra* at 675. We have already dealt with petitioner's contention that the term "special equity" can have two meanings under Florida law and held that it has a specific meaning. Nor did we find the court's order ambiguous in granting Frances a special equity rather than finding, as petitioner maintains, special equitites in Frances' favor that would support a finding of lump-sum alimony. Petitioner's argument that the court's labeling the award as special equity is not controlling is, therefore, weakened since the court's decision specifically granted an interest in petitioner's property to Frances.

Even though the court's decision is not dispositive, we believe that the fact that the Florida court found in a disputed divorce proceeding that Frances had a special equity in petitioner's estate provides strong support for respondent's position that Frances, in fact, had such a property right.[4] In light of the court's decision, we do not believe petitioner has shown otherwise.[5] Cf. *Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967).

We would reach this result even if we did not consider the Florida court's decision. It is, of course, clear that under Florida law a wife must perform more than her household duties[6] before she is entitled to special equity. *Tanner v. Tanner, supra; Steinhauer v. Steinhauer*, 252 So. 2d 825 (Fla. Dist. Ct. App. 1971); *Williams v. Williams*, 177 So. 2d 865 (Fla. Dist. Ct. App. 1965); *Robert v. Roberts, supra.*

The business operation of the ranch was handled at the family

---

[4] See *Capodanno v. Commissioner*, 69 T.C. 638, 644 n. 4 (1978), affd. 602 F.2d 64 (3d Cir. 1979); *Drummond v. Commissioner*, T.C. Memo. 1976–55.

[5] Petitioner also contends that the greater portion of his estate as of 1971 is directly attributable to increases in the value of land that Frances had no part in obtaining. Assuming this is so, we note nonetheless that the Florida court held that Frances "by her efforts has contributed to the accumulation of and increasing [petitioner's] estate." Moreover, even if the property was in the first instance petitioner's, we believe that Frances' continuing contributions during the marriage helped maintain and preserve the values of the ranch property and that this is sufficient to justify a finding of special equity in Frances' favor. Cf. *Mills v. Commissioner*, 54 T.C. 608 (1970), affd. 442 F.2d 1149 (10th Cir. 1971).

[6] There is a differnece between respondent's and petitioner's position on this point with respondent contending that it is the "ordinary housewife" not residing on a ranch to which Frances' activities must be compared while petitioner compares Frances' activities to those of the "ordinary ranch wife." We have found no case which supports petitioner's position nor is there anything in the record which indicates what are the duties of the "ordinary ranch wife."

home and Frances regularly took business messages. At times, she had to stay home at petitioner's request in order to receive messages, and when petitioner was out of town, she would try to solve problems arising from the calls. Sometimes this involved travel on her part.

After 1968, Frances also cooked in large quantities for use at the ranch. She frequently cooked dinner for business associates at home and occasionally cooked for cattle buyers, business associates, ranch employees, veterinarians, and mechanics at home or at cow camps. She directed how cattle should be slaughtered for use on the ranch and at times had to wait until the meat was packaged in order to take it home to freeze it.

Frances periodically helped petitioner keep the records on purebred cattle which the ranch was breeding. Prior to petitioner's father's death, Frances occasionally drove him to the pastures to check on the steers. She also wrote the checks for the business and rode with the cattle crew during cattle drives when she and petitioner were first married.

Frances traveled to the bus station to pick up parcels and to the town hardware store or various other towns to pick up supplies. When she and petitioner stayed at one of the cow camps on the ranch for a long period of time, she would return to the house to pick up the payroll and mail or make telephone calls if petitioner's phone broke down.

After petitioner's illness in 1941, and until the G. W. Mann Ranch was sold in 1959, Frances traveled with him on out-of-town buying trips, and accompanied him at business conferences, meetings, and cattle sales. Frances also drove a truck to aid in the feeding of cattle pellets to the cattle. On one occasion, Frances was sent by petitioner to purchase a bull at an auction. On another occasion, she traveled to another town to guarantee payment of a medical bill of one of the ranch's employees who was ill at the time. Once, she attended a reception for the county agriculture agent as a representative of the ranch when petitioner was out-of-town.

In conclusion, it appears that Frances was able to and did act in petitioner's stead when needed in his cattle-ranching operations. Based upon these facts, we hold that Frances performed more than her household duties and had a special equity in petitioner's business.

Petitioner maintains that two other factors show that the

payments were intended to be alimony. He points out that the periodic alimony payments were $626 and that adding the $7,500 per year awarded as a special equity (prorated monthly) totals monthly payments of only $1,251, a little under half on the $2,453.78 that Frances estimated as her monthly cost of living set forth in her financial statement submitted to the Circuit Court.[7] Petitioner also notes that Frances had no income-producing assets to supplement the amount she received from petitioner for living expenses and did not include any payments for her share of petitioner's property to offset her expenses. We discount the importance of these facts. That Frances originally asked for $2,453.78 of monthly support (later lowered to "upward of $1,000 per month, after income tax") does not mean that all periodic payments were intended to be alimony, but simply that the amount of alimony for which petitioner asked was reduced by the court. Frances also asked for a one-third equitable interest in petitioner's property, and this, too, was reduced to $150,000.

Petitioner next argues that the pleadings in the divorce action reflect Frances' lack of a present property interest. It is his position that in the "Response to Petition," Frances prayed only for "an award of property and property rights in keeping with her loss of rights of inheritance and dower as the surviving spouse of her husband," and, therefore, no special equity could have been awarded. Even if we agree with petitioner that payments made to release a husband from such inchoate rights are for the discharge of marital obligations imposed by law and constitute alimony (see *Lambros v. Commissioner*, 459 F.2d 69 (6th Cir. 1972), affg. T.C. Memo. 1971–135; *Wright v. Commissioner*, 62 T.C. 377 (1974), affd. 543 F.2d 593 (7th Cir. 1976);[8] cf. *United States v. Davis*, 370 U.S. 65 (1962)), we do not believe the pleadings support petitioner's position.

The full clause referred to by petitioner asks for "support money * * * and such additional and further awards in property and property rights accumulated by the husband over the 39 years of their marriage, and in keeping with her loss of rights of

---

[7]Petitioner specifically notes that in the financial statement, she provides as expenses for payment of taxes of $7,000 annually ($583.33 monthly) with respect to her projected monthly support payments of $2,453.78.

[8]See also *Long v. Commissioner*, T.C. Memo. 1977–284.

inheritance and dower as the surviving spouse of her husband." Therefore, relief was asked to provide not only for support and for her dower and inheritance rights but also for any additional and further awards in property and property rights. We note that in her petition, Frances set forth sufficient facts upon which special equity could be granted by the court.

Therefore, we agree with respondent that the "Response for Petition" was sufficiently broad to cover a request for special equity, which was, in fact, specifically requested by Frances in her memorandum brief submitted after the final hearing in the divorce proceedings.

Petitioner also makes note of the disparity in his and Frances' financial conditions and argues that permanent support as lump-sum alimony[9] was necessary in the event of his death in addition to the periodic alimony granted. The disparity in wealth and the fact that Frances needed income after petitioner's death are consistent with out holding that the payments were part of a property settlement. First, the fact that payments are not terminable upon the death or remarriage of the wife has been held to support a finding that payments are not alimony. *Sydnes v. Commissioner, supra; Land v. Commissioner,* 61 T.C. 675, 683 (1974); *Watkins v. Commissioner,* 53 T.C. 349, 360 (1969). Second, there is nothing which indicates that the $150,000 was fixed with regard to Frances' current needs (the court's opinion states only that it "cannot in good conscience limit the relief of the respondent wife to monthly alimony payments that would terminate upon petitioner's death"); that there is a fixed amount due and that the amount of payments were fixed without regard to the wife's needs also supports a finding that the payments are part of a property settlement. *Sydnes v. Commissioner, supra; Land v. Commissioner, supra.*

We must now deal with petitioner's alternative argument that the payments in respect to the special equity Frances had in his estate were in the nature of deferred compensation and deductible as ordinary and necessary business expenses. Petitioner contends that Frances' special equity was simply a right to be compensated (either in property or money) for the services she

---

[9]Respondent does not concede that lump-sum alimony under Florida law constitutes alimony for purposes of sec. 71. Because of our holding that the payments were for Frances' special equity, we do not reach this question.

rendered in petitioner's business. Respondent argues that there was never any compensation arrangement with respect to Frances' services, that Frances did not expect compensation for her services, and that petitioner could have paid Frances currently; or, more to the point, that petitioner's payments for Frances' special equity were made to compensate her for her vested interest in petitioner's property.

Although petitioner's argument may have some merit, we agree with respondent. Frances was awarded the property in recognition of her participation in the accumulation of the family wealth, not for services rendered. We believe that under Florida law, property acquired during married life or the enhanced value of property originally brought to the marriage by one spouse due to the joint efforts of both spouses constitutes jointly acquired property subject to division. The divorce decree, therefore, operated only to finalize the extent of Frances' interest in the property which was held in petitioner's name during the marriage. Cf. *Wilson v. Wilson*, 279 So. 2d 893 (Fla. Dist. Ct. App. 1973); *Steinhauer v. Steinhauer, supra; Banfi v. Banfi*, 123 So. 2d 52 (Fla. Dist. Ct. App. 1960). See also *Imel v. United States*, 375 F. Supp. 1102 (D. Colo. 1974), affd. 523 F.2d 853 (10th Cir. 1975); *Wiles v. Commissioner*, 499 F.2d 255 (10th Cir. 1974); *Collins v. Commissioner*, 412 F.2d 211 (10th Cir. 1969). Accordingly, we hold that the payments were made for Frances' property interest, and are nondeductible.

*Decision will be entered for the respondent.*