ESTHER L. HOUSTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DONALD E. HOUSTON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Houston v. Commissioner
Docket Nos. 4012-82, 7314-82.
United States Tax Court
T.C. Memo 1983-750; 1983 Tax Ct. Memo LEXIS 40; 47 T.C.M. (CCH) 662; T.C.M. (RIA) 83750; December 15, 1983. Lawson J. Clark, II, for the petitioner in docket No. 4012-82. Henry E. Bradshaw and Paul J. Corsaro, for the petitioner in docket No. 7314-82. Reid M. Huey, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $5,168 and $5,584 in Petitioner Esther L. Houston's income taxes for 1978 and 1979, respectively, *41 and deficiencies of $2,047 and $5,427 in Petitioner Donald E. Houston's income taxes for 1978 and 1979, respectively. After concessions, the issue remaining for decision in these consolidated cases is whether payments made by Esther to Donald pursuant to a divorce and settlement agreement entered into in 1978 constitute income to Donald under section 71 [1] and deductible expenditures to Esther under section 215. FINDINGS OF FACT These cases were stipulated in part, and the stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Esther L. Houston (Esther) resided in Crawfordsville, Indiana, during the years in issue and when she filed her petition, in Case No. 4012-82. She filed timely returns for 1978 and 1979 with the Internal Revenue Service In Indianapolis, Indiana. Petitioner Donald E. Houston (Donald) resided in Crawfordsville, Indiana, during the years in issue and when he filed his petition, in Case No. 7314-82. He filed timely returns in 1978 and 1979 with the Internal *42 Revenue Service in Indianapolis, Indiana. Esther and Donald (petitioners) were married in 1952. They have three children, the youngest of whom was 18 when petitioners were divorced in 1978. Both Esther and Donald were trained as educators and were employed in various capacities by the Indiana public school system during much of their married life. While married, they maintained joint checking accounts into which their pay checks were deposited and from which their personal expenses were paid. Petitioners first moved to Crawfordsville in 1961, at the request of Esther's mother, who owned and operated a nursing home called Ben Hur Home, Inc., (Ben Hur) located there. Donald took a job as a school principal in Crawfordsville and also worked for the Crawfordsville Park Department for 3 years. In addition, he was on call to Esther's mother to provide general maintenance work at the nursing home. During that period Esther worked as a teacher, although illness and familial obligations kept her at home for a few years. In 1965, Donald quit teaching to attend Purdue University on a full-time basis to obtain his Ph.D. He then served as Assistant Superintendent in Education in *43 the Indianapolis, Indiana, area. Meanwhile, Esther taught and attended Indiana State University, where she earned a Master of Science degree in education. Petitioners lived in Indianapolis from 1967 to 1969. Esther's mother died in 1970 and left her estate to Esther and Esther's two brothers, Fred Cowan (Fred) and Max Cowan (Max). Esther inherited a one-third interest (150 shares) in Ben Hur, one-third of a vacation home on Rocky Fork Lake, two house trailers, and her mother's house in Crawfordsville. Petitioners moved into the home Esther had inherited from her mother and subsequently spent approximately $50,000 on improvements to the house. About 1 year later, Fred sold his one-third interest in the Rocky Ford Lake property in equal shares to Max and his wife and to petitioners. Petitioners paid for their share by check(s) drawn on their joint checking account. A few years later Esther and Donald sold their (then one-half) interest in the lake property to Max and his wife and subsequently acquired with joint funds their own vacation home on Raccoon Lake. In 1971, Esther took over the management of the nursing home, and she and Donald entered into stock purchase agreements *44 to buy Max and Fred's shares of the corporation. Each agreement provided for Donald and Esther, as "Buyers," to pay to either Max or Fred, as "Seller," the purchase price of $125,000, which was payable in monthly installments of $1,000. Interest accrued on the unpaid balance at the rate of 6-1/2 percent per annum. The stock was acquired jointly, but only Esther was designated as the owner of the shares on the Schedules K-1 attached to the corporate tax return. No stock certificates reflecting the new ownership were ever issued. When petitioners acquired Ben Hur, part of the facility was almost 100 years old. Esther's mother had added two wings to the building, and petitioners added three or four more wings after Esther took over operations, thereby increasing patient capacity from 78 beds to 135 beds. The facility enjoyed a 98 percent occupancy rate. Parts of the building, however, were in relatively dilapidated. condition. An appraisal commissioned by Esther shortly after the divorce reported the value of Ben Hur to be $10,000 per bed. ("Per bed" value is the industry-wide method of expressing market value of nursing homes.) In 1977, petitioners formed Houland House Health *45 Care Center, Inc., to operate another nursing home; they capitalized that corporation for $10,000, which was drawn from petitioners' joint checking account. Esther owned 38 percent of the shares individually; Donald owned 37 percent of the shares individually; and a third party owned the remaining 25 percent of the shares. Houland House was newly constructed in 1977, and the outstanding indebtedness against it was approximately $500,000 at that time. This facility was licensed for 61 beds. Esther and Donald separated in August 1977. Esther retained Donald Buttrey, who practiced in Indianapolis, to represent her in the divorce negotiations; Mr. Buttrey hired Robert Wernle as local counsel in Crawfordsville for the court proceedings. C. Rex Henthorn represented Donald. At the time of the divorce, Donald was employed as a school administrator at a salary in the range of $20,000 per year. Throughout the fall of 1977, the parties attempted to divide their marital assets. They agreed on most of the distribution, but litigation appeared inevitable because Donald claimed ownership of part of the shares of Ben Hur that were acquired from Max and Fred, and Esther disputed Donald's *46 right to the shares. In anticipation of trial, Mr. Buttrey noticed Donald's deposition for Monday, January 30, 1978. When the lawyers gathered in Mr. Wernle's offices, however, they were surprised to learn that during the weekend the parties had settled their remaining differences; specifically, Esther had agreed to pay Donald $240,000 in monthly installments of $1,000 over 20 years, and Donald had agreed to relinquish all claim to Ben Hur stock. After conferring with his client and Mr. Wernle, Mr. Buttrey suggested that they take advantage of the presence of a court reporter by having him transcribe Mr. Buttrey's recitation of the terms of agreement so as to provide accurate notes from which he could draft the agreement.The "deposition" began, and Donald was sworn; Mr. Buttrey did most of the talking, however. Both petitioners were present. They and their counsel went "off the record" periodically to confirm their understanding of various terms of the agreement, after which Mr. Buttrey went back "on the record" to recite the terms to the reporter. During this process, Mr. Buttrey referred to a list of the parties' assets as of October 31, 1977, which had been prepared at his *47 direction, so that each item would be included in the agreement. Regarding the jointly owned 300 shares of stock in Ben Hur, Mr. Buttrey stated: And here Donald Houston will agree and the agreement will state that he relinquishes any and all right, title and interest that he may have claimed in and to those 300 shares, and under the agreement for the purchase of those shares. Regarding Esther's cash payments to Donald, Mr. Buttrey stated: The agreement will also provide for periodic payments from Esther Houston to Don Houston in the amount of $1,000 per month for a period of 20 years, stated in another ay, we're talking about an alimony judgment of $240,000 payable over 20 years. The agreement will provide for no interest. The periodic payments will begin January 1, 1978, and continue at the rate of $1,000 per month until paid. Now, both parties recognize that the payment due January 1, 1978 will not be paid until sometime prior to the end of 1978. Mrs. Houston: May we go off the record? Mr. Buttrey: Off the record. * * * Back at the point where we were talking about periodic payments, though, we want to be sure that those are deductible by Esther and includable *48 in income by Don. Now off the record. [Discussion and outside the record] Subsequent to this meeting, Mr. Buttrey prepared a written settlement agreement and submitted it to Mr. Henthorn for review. Section 3 of that agreement contains the terms in issue here, which were structured and phrased as follows: 3. The property of the parties shall be divided between them in accordance with the following provisions * * *: * * * (n) The following marketable securities shall be retained by the wife: * * * The 300 shares of the common capital stock of Ben Hur Home, Inc. presently held in escrow by the Elston Bank and Trust Company and issued 150 shares in the name of Max Cowan and 150 shares in the name of Fred Cowan, which shares are the subject of two separate agreements dated July 23, 1971 (the "Purchase Agreements"). The husband hereby acknowledges and shall advise the Elston Bank and Trust Company as escrow holder and Ben Hur Home, Inc., as issuer, in writing that he claims no interest in or to the 300 shares which are the subject of the Purchase Agreements; that upon payment in full of the amounts required to be paid therein the escrow holder is to deliver the certificates *49 to the wife as her sole separate property; that the Corporation is to issue new certificates at that time to the wife in her sole separate name (or otherwise as directed by her); and that husband has no right, title and/or interest in or to any dividends heretofore or hereafter accruing upon such shares, it being the intent and purpose hereof that the husband is acknowledging that he claims no right, title and/or interest in or to the 300 shares which are the subject of the Purchase Agreements. The wife shall make all payments due to the sellers under the Purchase Agreements in accordance with their respective terms and shall indemnify and hold harmless the husband from and against any and all liability arising out of or in connection with said Purchase Agreements. * * * (v) The wife or her estate shall pay, without relief from valuation or appraisement laws, and with attorneys' fees, to the husband or his estate the principal sum of Two Hundred Forty Thousand Dollars ($240,000) in 240 equal monthly installments of $1,000 each, the first of which shall be due and payable on the effective date of this Agreement, the second of which shall be due and payable on or before December 31, 1978, the *50 third of which shall be due and payable on the first day of the month following the effective date of this Agreement, and the balance of which shall be due and payable on the first day of each month thereafter until paid in full, same to be payable in all events regardless of the intervening death or remarriage of the husband or wife.Said installments shall bear no interest if paid by depositing same, postage prepaid, in the United States mail, on or before the due date, but shall bear interest at the rate of 10% per annum from and after the due date until paid, plus a late charge of $50.00 for each late payment. Under section 3 of the agreement, the following jointly held items were allocated to Esther: Item
Value *
Debt
Residence
$ 79,200
($48,917)
Furnishings
7,581
Raccoon Lake House
50,800
( 28,847)
Furnishings
4.315
Vacant Lot
10,000
Motorboat
3,000
Pontoon boat
3,000
Various notes receivable
24,924
( 21,965)
Parkwood Heath Club
Center, Inc. (150 shares)
21,000
Ben Hur Home, Inc.
(300 shares)
unknown
(151,495)
Total (excluding Ben Hur)
$203,820
($99,729)
*51 . Donald was to receive the following jointly held item: Item
Value
Apartment furnishings
$2,060
All other jointly held assets were divided equally between the parties. Other assets were identified as belonging to and were allocated to one or the other of the parties. The assets owned separately included the 380 shares and 370 shares of Houland House owned by Esther and Donald, respectively. The value ascribed to the shares in the property statement prepared by Mr. Buttrey was $10 per share. The settlement agreement was executed on February 8, 1978. The parties appeared in circuit court the next day, and Esther acknowledged that she and Donald had reached "a fair and equitable division of the property of the parties." The judge approved the settlement agreement and granted the parties their divorce. Esther paid to Donald $13,000 in 1978 and $12,000 in 1979. She deducted these amounts on her respective returns, but Donald did not include these amounts in his income. Respondent issued deficiency notices to both petitioners, denying Esther's deductions and adding the payments to Donald's gross income. ULTIMATE FINDINGS OF FACT The payments *52 from Esther to Donald were in settlement of Donald's property rights and not in discharge of a legal obligation arising out of the marital relationship. OPINION Section 71(a) includes in a husband's gross income periodic payments received in discharge of a legal obligation that, because of the marital or family relationship, is imposed on or incurred by the wife under a divorce decree or written instrument incident to the divorce. Section 215 allows a deduction to the wife for payments made to her husband that are includable in his income under section 71. The requirement that the payments be made in discharge of a legal obligation imposed "because of the marital or family relationship" has been interpreted to mean that the payments must be for support and not for the purpose of apportioning parties' marital assets. Beard v. Commissioner,77 T.C. 1275, 1283 (1981); Martin v. Commissioner,73 T.C. 255 (1979); sections 1.71-1(b)(4) and 1.71-1(d)(3)(i)(b), Income Tax Regs. Payments that are part of a property settlement are capital in nature and, therefore, are not subject to the provisions of section 71. Gammill v. Commissioner,73 T.C. 921 (1980), *53 affd. 710 F.2d 607 (10th Cir. 1982). All of the parties agree that the amounts in controversy here were derived from periodic payments made pursuant to a written instrument incident to the divorce. The only issue to be resolved is whether the payments were made in discharge of a legal obligation imposed because of the marital or family relationship or were the means of dividing the marital assets. The labels assigned to payments to a spouse by the parties in their agreement or by the divorce are not conclusive for tax purposes. Beard v. Commissioner,supra at 1283. The determination of the proper characterization of the payments rests upon the surrounding facts and circumstances. Gammill v. Commissioner,supra;Jackson v. Commissioner,54 T.C. 125 (1970). The factors that indicate that payments by one spouse to another are in the nature of a property settlement rather than a support allowance are: (1) That the parties in their agreement (or the court in its decree) intended the payments to effect a division of their assets, Porter v. Commissioner,388 F.2d 670, 671 (6th Cir. 1968), affg. *54 per curiam a Memorandum Opinion of this Court; Wright v. Commissioner,62 T.C. 377 (1974), affd. 543 F.2d 593 (7th Cir. 1976); (2) that the recipient surrendered valuable property rights in exchange for the payments, Mann v. Commissioner,74 T.C. 1249 (1980); (3) that the payments are fixed in amount and not subject to contingencies, such as the death or remarriage of the recipient, Widmer v. Commissioner,75 T.C. 405 (1980); McCombs v. Commissioner,397 F.2d 4 (10th Cir. 1968), affg. a Memorandum Opinion of this Court; (4) that the payments are secured, Widmer v. Commissioner,supra;Gammill v. Commissioner,supra; (5) that the amount of the payments plus the other property awarded to the recipient equals approximately one-half of the property accumulated by the parties during the marriage, Lambros v. Commissioner,459 F.2d 69 (6th Cir. 1972), affg. a Memorandum Opinion of this Court; Schottenstein v. Commissioner,75 T.C. 451 (1980); (6) that the need of the recipient was not taken into consideration in determining the amount *55 of the payments, McCombs v. Commissioner,supra; and (7) that a separate provision for support was provided elsewhere in the decree or agreement, Schottenstein v. Commissioner,supra. The absence of one or more of the above factors may tend to indicate that the payments are more in the nature of a support allowance, but neither any single factor nor the absence of such factor is conclusive. Inasmuch as petitioners' and their witnesses' testimony regarding the intended tax consequences of the payments was largely self-serving, we give it little weight. The witnesses agree that there were various positions taken by the parties during the negotiations but disagree as to the final oral statements of position regarding the tax consequences of the payments here in question. Mr. Buttrey testified at the trial that he had characterized the cash payments as alimony during the "deposition" and that neither Mr. Henthorn or Donald objected. Mr. Henthorn testified that he did not object to Mr. Buttrey's characterization of the lump-sum as an "alimony judgment" during the recitation of the agreement because Indiana courts frequently used the term "alimony" *56 to refer to property settlements as well as support arrangements. See Nichols v. Hensler,528 F.2d 304, 307-308 (7th Cir. 1976); Widmer v. Commissioner,supra at 408-409; Savage v. Savage,176 Ind. App. 89, 374 N.E.2d 536, 538 (1978). Donald testified that he did object to Mr. Buttrey's characterization of the payments. Esther acknowledged that Donald objected to receiving "alimony" but insisted that Donald ultimately agreed to pay the taxes on the installments. Mr. Wernle directly contradicted Donald's testimony. The document as executed does not contain any specific language regarding the intended tax treatment of the cash payments. Mr. Buttrey attributed his failure to include such specific language to his efforts to draft the agreement to comply with both his understanding at the time of Indiana law, which he believed would prohibit support payments in this particular instance, and his understanding of the parties' agreement, which he thought was for Donald to report the payments as income. Although he testified at trial that he believed the agreement as written "is perfectly consistent with deductibility [for Esther], *57 " when Mr. Buttrey was asked whether he thought the installment payments were "in the nature of support," he replied, "No, I am not saying that at all. I am saying that it was a manner in which we could resolve this matter and transfer some assets over at this time and make payments over a period of time." Esther and her counsel now contend that the agreement is ambiguous as to the purpose of the payments. We do not agree, but we note that if there were any ambiguities in the agreement, they would, of course, be resolved against the draftsman--Mr. Buttrey--and his client. See Rieth-Riley Construction v. Auto-Owners Mut. Ins.,408 N.E.2d 640, 645 (Ind. App. 1980). In any event, the controlling intention relates to the purpose of the payments and not the attempted manipulation of the tax consequences. See Beard v. Commissioner,supra at 1289. The written embodiment of petitioners' agreement is the most reliable measure of their intent, and the unambiguous language and structure of the settlement agreement characterize the payments as part of the division of the parties' marital assets. Other factors present here also compel our conclusion *58 that the installment payments were part of a property settlement. For example, the payments were fixed in amount and were not contingent upon Donald's death or remarriage. In addition, when we compare the net value of the marital assets received by Esther to those received by Donald we are convinced that the payments were designed to balance the property division. [2]
*59 Donald earned an adequate salary as a school administrator and had sufficient capacity to support himself. Thus, under Indiana state law, he was ineligible for maintenance payments from his wife. Ind. Code. 31-1-11.5-9(c) (1976); Wilhelm v. Wilhelm,397 N.E.2d 1079 (Ind. App. 1979); Johnson v. Johnson,174 Ind. App. 408, 367 N.E.2d 1147 (1977). Although the Indiana Dissolution of Marriage Act, under which petitioners were divorced, was relatively new in 1978, the Federal tax law regarding the tax treatment of periodic payments was not. Petitioners and their counsel were certainly cognizant of tax considerations when the agreement was drafted, inasmuch as they affirmatively assert that those consequences were the subject of negotiation.If there was a meeting of the minds on that subject, they were perfectly capable of expressing it in the documentation. See Campbell v. Lake,220 F.2d 341 (5th Cir. 1955). After examining all of the facts and circumstances, we conclude that petitioners intended precisely what the settlement agreement provided--that the installment payments were part of a property division. The payments are thus *60 not taxable to Donald nor deductible to Esther. Decision will be entered under Rule 155 in docket No. 4012-82.
Decision will be entered for petitioner in docket No. 7314-82.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
*. These are the values reported on the property statement prepared at the direction of Mr. Buttrey, some of which were not stated in the final agreement.↩
2. Esther argues on brief that Donald's shares of Houland House were worth approximately $176,000 ($16,000 per bed) at the time of the divorce and that Donald "in essense, received an asset of substantial value which had been acquired primarily through the efforts of Mrs. Houston." We cannot give much weight to Esther's current opinion of the value of the stock, however, especially in light of the fact that her own attorney ascribed a much lower value to it when preparing the property statement utilized by petitioners when dividing their property. The parties' intentions must be inferred from their knowledge at the time of the agreement. The nature of the marital assets makes precise valuation impossible here, but, in any event, it is indisputable that, apart from the cash payment, Esther received the significantly larger share of the property.↩